# ADDENDUM

# TABLE OF CONTENTS

**Page**

Docket Text Of Oral Order Enjoining Petitioner's Removal (Aug. 25, 2025) (ECF 13) ........................ Add.1

Transcript of August 25 Conference (Aug. 25, 2025) (ECF 14) ........................ Add.2

Letter Order Continuing Injunction Against Petitioner's Removal (Aug. 27, 2025) (ECF 20) ........................ Add.20

Letter Order Further Continuing Injunction Against Petitioner's Removal (Sept. 26, 2025) (ECF 31) ........................ Add.21

Memorandum Opinion Granting Habeas Relief (Dec. 11, 2025) (ECF 110) ........................ Add.22

Order Granting Habeas Relief (Dec. 11, 2025) (ECF 111) ........................ Add.53

Memorandum Order Enjoining ICE Detention (Feb. 17, 2026) (ECF 141) ........................ Add.55

The Government's Renewed Motion to Dissolve Injunctions (Mar. 20, 2026) (ECF 142) ........................ Add.65

Scheduling Order (Apr. 7, 2026) (ECF 148) ........................ Add.78

The Government's Notice of Appeal (Apr. 17, 2026) (ECF 163) ........................ Add.84

Memorandum Order Denying Motion For Indicative Ruling (May 18, 2026) (ECF 177) ........................ Add.87

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**District of Maryland**

**Notice of Electronic Filing**

The following transaction was entered on 8/25/2025 at 4:54 PM EDT and filed on 8/25/2025

| | |
|---|---|
| **Case Name:** | Abrego Garcia v. Noem et al |
| **Case Number:** | 8:25-cv-02780-PX |
| **Filer:** | |
| **Document Number:** | 13(No document attached) |

**Docket Text:**
**ORAL ORDER directing that, at least until a schedule is set, Petitioner Kilmar Abrego Garcia is not to be moved from his current detention facility, principally to preserve access to both his criminal and habeas counsel, and further directing that he is not to be removed from the United States. Signed by Judge Paula Xinis on 8/25/2025. (mg3s, Deputy Clerk)**

**8:25-cv-02780-PX Notice has been electronically mailed to:**

Jonathan Gordon Cooper jonathancooper@quinnemanuel.com, ecf-f8f66fa03bc4@ecf.pacerpro.com

Rina Mahesh Gandhi rina@murrayosorio.com, karina@murrayosorio.com, nleus@murrayosorio.com, ssandoval@murrayosorio.com

Simon Y Sandoval-Moshenberg ssandoval@murrayosorio.com, 8106988420@filings.docketbird.com, karina@murrayosorio.com, nleus@murrayosorio.com

**8:25-cv-02780-PX Notice will not be electronically delivered to:**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

SOUTHERN DIVISION

KILMAR ARMANDO ABREGO GARCIA, ) CIVIL ACTION
) NO. PX-25-2780
Petitioner, )
)
v. )
)
SECRETARY KRISTI NOEM et al., )
)
Respondents. )

TRANSCRIPT OF TELEPHONIC PROCEEDINGS
BEFORE THE HONORABLE PAULA XINIS
UNITED STATES DISTRICT JUDGE
MONDAY, AUGUST 25, 2025; 2:03 P.M.
GREENBELT, MARYLAND

APPEARANCES:

FOR THE PLAINTIFF:

QUINN EMANUEL URQUHART & SULLIVAN LLP
BY: JONATHAN G. COOPER, ESQUIRE
BY: ANDREW J. ROSSMAN, ESQUIRE
BY: OLIVIA G. HORTON, ESQUIRE
BY: SASCHA N. RAND, ESQUIRE
300 I Street NW
Washington, DC 20005
(202) 538-8000
-and-
MURRAY OSORIO PLLC
BY: SIMON Y. SANDOVAL-MOSHENBERG, ESQUIRE
4103 Chain Bridge Road, Suite 300
Fairfax, Virginia 22030
(434) 218-8376

OFFICIAL COURT REPORTER:
Renee A. Ewing, RPR, RMR, CRR - (301) 344-3227

***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***

APPEARANCES: (Continued):

FOR THE DEFENDANTS:

U.S. DEPARTMENT OF JUSTICE
BY: DREW ENSIGN, ESQUIRE
BY: BRIDGET O'HICKEY, ESQUIRE
BY: ERNESTO MOLINA, ESQUIRE
950 Pennsylvania Avenue NW
Washington, DC 20004
(917) 319-7275

(Call to order of the Court.)

THE DEPUTY CLERK: The matter now pending before this Court is Civil Case No. 25-cv-2780, Kilmar Armando Abrego Garcia vs. Noem et al. The matter now comes before the Court for a telephone conference.

Counsel, please identify yourselves for the record beginning with counsel for the plaintiff.

MR. SANDOVAL-MOSHENBERG: Good afternoon, Your Honor. Simon Sandoval-Moshenberg for Petitioner.

MR. ROSSMAN: Good afternoon, Your Honor.

MR. ENSIGN: Good afternoon, Your Honor.

MR. ROSSMAN: Good afternoon, Your Honor. It's Andrew Rossman for Petitioner as well, as well as colleagues Mr. Cooper and Mr. Rand.

Apologies, Mr. Ensign.

MR. ENSIGN: No apologies needed.

Drew Ensign for governmental respondents.

THE COURT: Mr. Ensign, are by yourself or do you have someone else on the line for you?

MR. ENSIGN: Your Honor, I believe Ernesto Molina and Bridget O'Hickey are also on the call.

THE COURT: Okay. Is there anyone else on the line with us? I know we have a public access line, but anyone representing any of the parties or any of the parties themselves?

MS. HORTON: Olivia Horton, Quinn Emanuel, is here as well for the Petitioner.

THE COURT: I'm sorry. Can you repeat that?

MS. HORTON: Olivia Horton with Petitioners.

THE COURT: Okay. All right. Thank you all.

So, Mr. Abrego Garcia has filed a new case. There is a standing order, in addition to my previous order which prohibits the removal of Mr. Abrego Garcia from the Continental United States, and by my count, that order -- those two orders would not expire until Wednesday, Wednesday morning, I believe. But we are going to need to hear more about what is in this habeas petition, and I am willing to move as fast as is just, which means that I have roughed out a schedule for the defendants' response, and, in my mind, what would likely be an evidentiary hearing all to take place this week.

And so what I would throw out to you, Mr. Ensign, because, really, in my view, it's going to be up to you whether you want more time, but that I think this can be accomplished as long as everyone is, you know, operating in good faith to respond to the petition by Wednesday at five p.m., to give Mr. Abrego Garcia an opportunity to reply by Thursday. By Thursday at five, both sides would tell me which witnesses they are intending to call, and then we will have a hearing on Friday at 11 a.m.

And I can -- I can tell you now where at least I am

provisionally as to why I believe extending a TRO is necessary. First, I think that the -- the plaintiffs have made a sufficient showing of, at least at this very, very early juncture where I don't have anything else in front of me and I don't have the government's response, but I do have what the parties are saying to the world, several grounds on which there may be jurisdiction for me to exercise relief.

And so the first is that there appears to be a violation or at least if -- if -- if the defense makes do on what they are telling the public they will do, there may be a violation of 8, U.S.C., 1231(b)(2)(A)(ii), which is the nondiscretionary obligation to remove Mr. Abrego Garcia to his designated country of choice, at least that's how I read the prevailing law, and so, again, we are sort of right back to where we started from if that is the case, and it's a big "if" because we are in the preliminary stages, then the Attorney General would be acting outside of her lawful authority, thus triggering my jurisdiction.

Second, there has been no -- no proffer. I don't know what, if anything, the defendants will say about any protections that Uganda has offered to Mr. Abrego Garcia through the United States akin to what Costa Rica has done in terms of assuring that Mr. Abrego Garcia would be able to move about freely in Uganda, would have residency papers or refugee status, would not be restyled to El Salvador. There is just

nothing right now on the record in that regard.

So the silence is taken as, certainly in contrast to what's been provided by the country of Costa Rica, the -- the contrast is significant, and I take that as a fact, which, at this juncture, demonstrates a likelihood of success on the merits that Mr. Abrego Garcia doesn't have any protections against restylement or deprivation of freedom or liberty.

Again, Government can certainly right the ship by showing me how it is that Uganda has made such representations that Mr. Abrego Garcia's freedom won't be curtailed, that he will not be subject to torture or persecution, or that he otherwise would not be restyled to El Salvador which would just be an end run around the withholding of removal in this country that is still valid.

So, I guess that there is just an absence of process. At least at this juncture, there is nothing on the record which demonstrates that Mr. Abrego Garcia has been given the right to seek withholding of removal or to persist in a credible fear determination. He submitted his credible fear statement, but I just have no -- nothing on the record that suggests the defendants are taking that in good faith and -- and operating as it should under the INA.

By contrast, what I have are reports out to the public within a very short period of time taking Mr. Abrego Garcia into custody that they are processing him for deportation to

Uganda; he will be deported. It's not equivocal, which suggests that there hasn't been any process.

And lastly, ^ anti simm reported to the world, as well as to the criminal court in Tennessee and finally to me through this petition, that Mr. Abrego Garcia is to be deported to Uganda from the defense because he has exercised his constitutional right to a trial, and conditioning removal to Uganda based on that exercise of his right to a trial, as opposed to if he had pled guilty, he could go to Costa Rica is -- that showing has been made, at least, again, to trigger a hearing, to allow for my exercise of a TRO until we can get through the hearing.

That showing has been made, and it is, in my view, plain, you can't do that. You can't, you know, you can't condition the relinquishment of constitutional rights in that -- in that regard. You would never get a knowing and voluntary guilty plea out of anyone if you could do that.

So those are just, again, for the record, my preliminary views. All I really want to do today is make sure that the schedule I have proposed to you all works. And, again, I will turn to the defendants first because if you tell me you need more time, then you will certainly have more time, but the TRO will be in place until we can get through this process.

So the schedule that I laid out, Mr. Ensign, does that work from the defendants' perspective?

MR. ENSIGN: Your Honor, if I may, I would like to talk to my clients about that. I mean, I think we can certainly file a brief by then.

My understanding, too, though, is that removal is not imminent, that third country removals often take some time, and that that is not likely to occur in the sort of window where a TRO would otherwise be in place. And, so, if -- if I might, I'd like to consult with my clients as well as plaintiffs to see if we can't agree on some other schedule that might provide a -- a pace that -- that may not, you know, may not be as quick but may not be necessary here.

THE COURT: And this is with the understanding that your clients are absolutely forbidden at this juncture to remove Mr. Abrego Garcia from the Continental United States. That is the understanding that we have. You know that's the order in place?

MR. ENSIGN: Your Honor, yes. We certainly understand that, and we certainly understand there are two injunctions in place, both -- both Your Honor's prior injunction in the other case and then the standing order that was entered in this case, and that they are overlapping, and we -- and we understand them both to prohibit removal of Mr. Abrego Garcia from the United States during -- during the windows that they are in effect.

THE COURT: And I am going to take it from you, as an

officer of the Court and on behalf of your clients, that there is the fullest intent to abide by those orders, which would also give you time to talk to the plaintiffs and figure out whether there is a schedule that is mutually agreeable different than what I just laid out. Is that accurate?

MR. ENSIGN: That is accurate, Your Honor.

THE COURT: Okay. All right. Who is speaking on behalf of Mr. Abrego Garcia?

MR. SANDOVAL-MOSHENBERG: Simon Sandoval-Moshenberg, Your Honor.

THE COURT: So, Mr. Moshenberg, what I am hearing from Mr. Ensign is that what might make sense is for you all to meet and confer offline, and if you can arrive at a mutually agreeable briefing schedule and hearing schedule, then you would propose that to me. If you are in agreement and I can do it -- you know, I might have to tinker here or there in terms of a hearing date because I want to give you all enough time, the time you need -- but I would enter that order, and then I would extend the TRO which is in place right now to cover through my decision, which I promise to you I will move as quickly as possible on it.

MR. SANDOVAL-MOSHENBERG: Yes, Your Honor. I think that --

THE COURT: What --

MR. SANDOVAL-MOSHENBERG: -- is very appropriate.

THE COURT: Okay. Go ahead. Sorry.

MR. SANDOVAL-MOSHENBERG: Pardon me, Your Honor. That's appropriate, Your Honor. We can meet and confer this evening, and, undoubtedly, I am sure we will be able to file a proposed briefing order by tomorrow morning.

There is one other matter I want to bring to the Court's attention as sort of an interim matter if the Court would indulge me.

THE COURT: Sure. Just one second.

Mr. Ensign, good with you, once we hang up here, to meet and confer with the plaintiffs and propose a schedule, if you can reach one, by the morning?

MR. ENSIGN: Yes, Your Honor. That's acceptable for the governmental respondents, and if -- if we are unable to do so, I think we would recognize that the schedule that Your Honor had proposed would -- would govern then.

THE COURT: Okay. And -- and with that, the milestone dates that I want you all to include is the Respondents' response to the petition, the reply to the response, notice of witnesses, and an evidentiary hearing that I am, in my own head, thinking let's block, you know, at least, because I tend to -- based on the past as prologue, I would say at least until -- from 11 until the end of the day just so we have some time. Those are the milestone dates that I want you all to meet and confer about.

In terms of hearing dates, give me a couple that work for you all, like a Tuesday or a Wednesday or Wednesday or a Thursday, so that I can hopefully maximally accommodate you.

Does that make sense to both sides?

MR. SANDOVAL-MOSHENBERG: Yes. Thank you, Your Honor.

MR. ENSIGN: Yes, Your Honor.

THE COURT: Okay. Great.

Mr. Moshenberg, what is the other issue?

MR. SANDOVAL-MOSHENBERG: Thank you, Your Honor.

We have just heard from our client that at least as of I think about 45 minutes ago, he's currently detained at a detention center in the Commonwealth of Virginia. I don't want to say which one for sort of government security reasons.

THE COURT: Right. Sure.

MR. SANDOVAL-MOSHENBERG: I have had several situations recently in which district judges, most recently in the District of New Jersey just earlier this month, ordered a habeas corpus hearing with a writ of habeas corpus ad testificandum, and ICE and the marshals were unable to bring the individual back up from Louisiana, south Texas for the hearing.

And, so, especially since we are on a very short notice here, and it does look like this is going to be a matter of days or at most weeks and not months, I would request that in

the interim order, the Court also order ICE to hold him within 200 miles of the courthouse.

There is four very large detention facilities all within 200 miles of the courthouse: two in Virginia, one in Pennsylvania, one in New Jersey. And we did raise this in our request for relief at subparagraph (b).

THE COURT: Right. Well, my inclination on that is also to meet and confer and see if you can come to agreement. And, Mr. Ensign, I would urge some agreement, if, for no other reason, in this case, it would impact not only this case but Mr. Abrego Garcia's right to counsel in the Tennessee case, and we had that conversation at the last evidentiary hearing. It is a -- it's an issue that I addressed in my prior decision. I take it as a live issue. And I understand that Mr. Abrego Garcia has criminal counsel in New York, so it may very well serve purposes to come to some agreement, and if you cannot, then just let me know that tomorrow morning, and I will address it.

Are you concerned he will move tonight?

MR. SANDOVAL-MOSHENBERG: Yes, Your Honor. That's exactly our concern, and it's just my expectation based on experience.

THE COURT: Okay. Let's see what Mr. Ensign -- Mr. Ensign, can you assure the Court that Mr. Abrego Garcia will not be moved from the detention center in -- where he is

right now?

MR. ENSIGN: Your Honor, I don't have authorization to do that. I am not aware of any plans to move him, but I -- I don't have authorization currently to agree to that. I am happy to speak to my client, but I don't -- I don't have authorization to do so at this moment.

THE COURT: Okay. Well, then, I will add to the order that to provide at least until we get a schedule set and you have an opportunity to talk to your clients about whether they can consent to keep him in -- in a Virginia jail where he is right now, so there is a bed, I will -- I will order that he not be removed, principally, to have access to both criminal and habeas counsel because there is a long, factual predicate in the press and in both dockets that right now, those two cases are intersecting, and Mr. Abrego Garcia has had to make important decisions regarding his constitutional rights, exercising them, refraining to exercise from them, quote, assistance of counsel, which is critical. So I do find that there is a sufficient basis to order that he not be moved from this current detention facility and that you let me know in the morning where your clients stand on that, what your position is, and I will take it from there.

Is that clear to you, Mr. Ensign?

MR. ENSIGN: Yes, Your Honor.

THE COURT: Do you need me to put this in writing

tonight, or will my oral pronouncement on the record now suffice?

MR. ENSIGN: Your Honor, I think your oral pronouncement will suffice, and I will relay that to the clients.

THE COURT: Okay. All right. Mr. Moshenberg, is that satisfactory?

MR. SANDOVAL-MOSHENBERG: Yes, Your Honor. Thank you.

THE COURT: Anything else we need to discuss because I want to give you all time to talk without me?

MR. SANDOVAL-MOSHENBERG: Nothing further for Petitioner, Your Honor.

MR. ENSIGN: Your Honor, for -- for defendants, it would be helpful to know if the -- if Mr. Abrego Garcia has attempted to reopen his immigration proceedings. Your Honor's preliminary injunction Order 17 recognized that he would, quote, be able to, quote, raise any credible fears through the appropriate channels in the immigration process, end quote. That is -- the appropriate procedural mechanism for that would be a motion to reopen his immigration proceedings and to move to stay removal in those immigration proceedings.

Certainly, if -- if we knew the status of that -- I am happy to try to -- to ascertain that separately, but this is moving very quickly, and knowing the status of that would

certainly inform the legal arguments that we make to this Court either -- either on our Wednesday filing or whenever that filing may be.

THE COURT: Mr. Moshenberg.

MR. SANDOVAL-MOSHENBERG: Yeah. I can respond to that. Thank you, Your Honor.

I can certainly represent to the Court that no motion to reopen has been filed at this time. What we have submitted at this time is the reasonable fear request, which is attached to the -- to the complaint as an exhibit.

If the government is sort of essentially stipulating that a motion to reopen is the proper procedural mechanism here, I think one of the issues in this case is it's not really too clear what the procedural mechanism is, but if the government -- I can speak with Mr. Ensign about that, you know, this afternoon --

THE COURT: Okay.

MR. SANDOVAL-MOSHENBERG: -- and we will sort of -- we will sort of include that in our filing tomorrow morning.

THE COURT: Right. Because I think in the end of the day, if there is sufficient and adequate process that will be given to Mr. Abrego Garcia, and this is a real oversimplification, it takes some of the issues before me off the table. And, again --

MR. SANDOVAL-MOSHENBERG: Yes, Your Honor.

THE COURT: Yeah.

MR. SANDOVAL-MOSHENBERG: I apologize for continuing to interrupt you. The -- the telephonic medium is difficult.

Yes. I mean, part of the issue here is that, you know, from the nearly day-long evidentiary hearing we had before this Court, we are still not 100 percent clear as to what even the government's position is as to what the process is, so to the extent that we can clarify that tonight, that will be very, very helpful.

THE COURT: Okay. Then, Mr. Ensign, I guess you have the short answer, and you all can add that to agenda for the meet and confer, and I will look for your submission to me, why don't we say, ten a.m. tomorrow, and we will take it from there.

MR. SANDOVAL-MOSHENBERG: Thank you, Your Honor.

MR. ENSIGN: Thank you, Your Honor.

THE COURT: Okay. Anything else for me before we sign off?

MR. SANDOVAL-MOSHENBERG: Nothing further.

MR. ENSIGN: Your Honor --

THE COURT: Yes.

MR. ENSIGN: Your Honor, certainly for the defendants, just to preserve the record, we -- we certainly object to the -- to the Court's finding and -- but we will explain the basis for those legal disagreements in our

forthcoming filing.

THE COURT: That would be -- that's what I expect. Okay. All right. Thank you very much for your time. I look forward to the proposed schedule tomorrow and anything else you wish for me to know so we can set up the briefing schedule. And now one additional matter to discuss is whether Mr. Abrego Garcia, whether defendants have any continued objection to holding Mr. Abrego Garcia in the current detention facility for the reasons that we discussed today because then I will have to deal with that separately.

Okay? All right. Thank you all for your time.

MR. ENSIGN: Understood, Your Honor.

THE COURT: See you soon.

MR. ENSIGN: Thank you, Your Honor.

MR. SANDOVAL-MOSHENBERG: Thank you, Your Honor.

(The proceedings were concluded at 2:24 p.m.)

C E R T I F I C A T E

I, Renee A. Ewing, an Official Court Reporter for the United States District Court for the District of Maryland, do hereby certify that the foregoing is a true and correct transcript of the stenographically reported proceedings taken on the date and time previously stated in the above matter; that the testimony of witnesses and statements of the parties were correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription to the best of my ability; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

Renee A Ewing

Renee A. Ewing, RPR, RMR, CRR
Official Court Reporter
August 25, 2025

# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

CHAMBERS OF
PAULA XINIS
UNITED STATES DISTRICT JUDGE

6500 CHERRYWOOD LANE
GREENBELT, MD 20770

August 27, 2025

Re: 25-cv-2780, *Abrego Garcia v. Noem, et al.*

**LETTER ORDER**

Dear Parties:

For the reasons discussed during today's recorded scheduling conference, the Court sets the following schedule:

| | |
|---|---|
| **September 22, 2025** | Respondents' response to the habeas petition is due. |
| **September 29, 2025** | Petitioner's reply is due. |
| **October 2, 2025**<br>**5:00 PM** | Parties shall submit witness lists to the Court. |
| **October 6, 2025**<br>**10:00 AM** | Evidentiary Hearing<br>Courtroom 2C, United States District Court, Greenbelt, Maryland. |

Respondents have represented that Petitioner will not be removed from the continental United States prior to the October 6, 2025 hearing. Nonetheless, Respondents are **ENJOINED** until further order of the Court from removing Petitioner from the continental United States, and must ensure that Petitioner remains detained within 200 miles of the Greenbelt, Maryland courthouse to preserve his access to both criminal and habeas counsel.

Although informal, this correspondence constitutes an Order of the Court and shall be docketed as such.

Sincerely,

Paula Xinis
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

CHAMBERS OF
PAULA XINIS
UNITED STATES DISTRICT JUDGE

6500 CHERRYWOOD LANE
GREENBELT, MD 20770

September 26, 2025

Re: 25-cv-2780, *Abrego Garcia v. Noem, et al.*

**LETTER ORDER**

Dear Parties:

Pending is Respondents' Motion to Continue (ECF No. 30) and Petitioner's Motion for Leave to Serve Document Requests (ECF No. 27). Respondents' Motion to Continue is GRANTED. The evidentiary hearing previously set for October 6, 2025, is converted to an in-person status conference to address ECF No. 27 and to set scheduling in light of the pending discovery requests and ongoing immigration proceedings.

Consistent with the Government's representations, and with its consent, Respondents remain ENJOINED until further order of the Court from removing Petitioner from the continental United States. Respondents must also ensure that Petitioner remains detained within 200 miles of the Greenbelt, Maryland courthouse to preserve his access to both criminal and habeas counsel. Respondents are reminded that the Court's prior Order remains in full force and effect.

Although informal, this correspondence constitutes an Order of the Court and shall be docketed as such.

Sincerely,

Paula Xinis
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| | * | |
| KILMAR ARMANDO ABREGO GARCIA, | * | |
| *Petitioner,* | * | |
| | | Civil Action No. 8:25-cv-02780-PX |
| v. | * | |
| KRISTI NOEM, *et al.*, | * | |
| *Respondents.* | | |
| | * | |

***

**MEMORANDUM OPINION**

Kilmar Armando Abrego Garcia ("Abrego Garcia") petitions this Court for a writ of habeas corpus to release him from the custody of Respondents, Secretary of the Department of Homeland Security ("DHS") Kristi Noem, United States Immigration and Customs Enforcement ("ICE") Director Todd Lyons, ICE Baltimore Field Office Director Nikita Baker, and Attorney General Pamela Bondi. ECF No. 1. Since Abrego Garcia's return from wrongful detention in El Salvador, he has been re-detained, again without lawful authority. *Id.* For this reason, the Court will GRANT Abrego Garcia's Petition for immediate release from ICE custody.

## I. Background

The history of Abrego Garcia's case is as well known as it is extraordinary. The Court will not recite all of it here, but only those events necessary to explain why Abrego Garcia is entitled to immediate release.

Abrego Garcia is a national of El Salvador. At sixteen years old, in 2012, he came to the United States as a noncitizen[1] to avoid persecution by the notorious gang, Barrio 18. ECF No. 1-1 at 4; *Abrego Garcia v. Noem,* 8:25-cv-00951-PX ("*Abrego I*"), ECF No. 31 at 2–3 (D. Md. 2025). For many years thereafter, he lived and worked in Maryland. *Abrego I*, ECF No. 31 at 3. But in 2019, after a brief encounter with Prince George's County police, ICE took custody of Abrego Garcia and commenced removal proceedings to El Salvador.[2] *Id*. at 3–4.

Abrego Garcia, in turn, asked an Immigration Judge ("IJ") for three kinds of relief from removal: (1) withholding of removal under the Convention Against Torture ("CAT") 8 C.F.R. § 1208.16, (2) statutory withholding of removal provided in 8 U.S.C. § 1231(b)(3), and (3) asylum. ECF No. 1-1. Statutory withholding of removal shields a noncitizen from removal to a particular country if he demonstrates that more likely than not, his "life or freedom would be threatened in that country because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). Like statutory withholding, CAT withholding shields a noncitizen from being removed to a country if the noncitizen demonstrates that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). Asylum is a legal protection granted to a noncitizen "who is outside any country of such person's nationality . . . who is unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, that country because of persecution or a well-founded fear of persecution on account of . . . membership in a particular social group." 8. U.S.C. § 1101(a)(42). *See also* 8 U.S.C. § 1158(b)(1)(A).

---

[1] This opinion uses the term "noncitizen" as equivalent to the statutory term "alien," in keeping with recent preferred nomenclature. *Avilez v. Garland*, 69 F.4th 525, 527 n.1 (9th Cir. 2023) (collecting cases). *See Barton v. Barr*, 590 U.S. 222, 254 n.2 (2020) (Kavanaugh, J., concurring) ("This opinion uses the term 'noncitizen' as equivalent to the statutory term 'alien.'" (citing 8 U.S.C. § 1101(a)(3)). *See, e.g., United States v. Palomar-Santiago*, 593 U.S. 321 (2021); *Patel v. Garland*, 596 U.S. 328 (2022).

[2] Abrego Garcia's arrest did not result in criminal charges. *Abrego I*, ECF No. 31 at 4.

After an evidentiary hearing at which Abrego Garcia testified and was found credible, the IJ granted him statutory withholding of removal and denied the remaining requests. ECF No. 1-1 at 15. The IJ memorialized this determination in a written "memorandum of decision and order" dated October 10, 2019 (the "October 10 withholding decision" or "withholding decision"). *Id.*

The October 10 withholding decision referenced as "procedural history" Abrego Garcia's concession at a prior hearing that he was an El Salvadoran national who entered the United States without lawful permission, and that an IJ "found his removability to be established by clear and convincing evidence." ECF No. 1-1 at 3. But nothing suggests the IJ ordered Abrego Garcia removed to El Salvador. In fact, the withholding decision twice erroneously suggested that the stated country of removal from which Abrego Garcia sought relief was Guatemala. *Id.* at 9 ("DHS has failed to carry their burden to show that there are changed circumstances in Guatemala that would result in the Respondent's life not being threatened . . . ."); *id.* at 14 ("DHS has not shown there are changed circumstances in Guatemala that would result in the Respondent's life not being threatened, or that internal relocation is possible and reasonable under the circumstances.").

The withholding decision also included a separate "order" that did not command Abrego Garcia's removal to El Salvador or anywhere else. *Id.* The order reads in its entirety:

**ORDER**

It is hereby ordered that:

I. the Respondent's application for asylum pursuant to INA[3] § 208 is **DENIED**;

II. the Respondent's application for withholding of removal pursuant to INA § 241(b)(3) is **GRANTED**; and

[3] The Immigration and Nationality Act, § 101 *et seq*., 8 U.S.C. § 1101 *et seq.*

III. the Respondent's application for withholding of removal under the Convention Against Torture is **DENIED**.

ECF No. 1-1 at 15 (dated and signed by IJ).

For the next six years, Abrego Garcia lived and worked in Maryland subject to an ICE order of supervision. *Abrego Garcia I*, ECF No. 1-3. *See also* ECF No. 32-10 (employment authorization identification card); ECF No. 33 (order of supervision). But on March 12, 2025, while driving with his son in the car, ICE agents pulled over Abrego Garcia and arrested him. *Abrego I*, ECF No. 31 at 4. Three days later, Respondents forcibly expelled him, along with 252 Venezuelan and Salvadoran nationals, to El Salvador where they were detained in the Terrorism Confinement Center ("CECOT"). *See* Nicholas Riccardi and Regina Garcia Cano, *Trump administration deports hundreds of immigrants even as a judge orders their removals be stopped*, AP NEWS (Mar. 17, 2025), https://apnews.com/article/trump-venezuela-el-salvador-immigration-dd4f61999f85c4dd8bcaba7d4fc7c9af. While at CECOT, the men, including Abrego Garcia, were systematically beaten and tortured. *See "You Have Arrived in Hell," Torture and Other Abuses Against Venezuelans in El Salvador's Mega Prison,* HUMAN RIGHTS WATCH (Nov. 12, 2025), https://www.hrw.org/report/2025/11/12/you-have-arrived-in-hell/torture-and-other-abuses-against-venezuelans-in-el. *See also Abrego I*, ECF No. 211-3 ¶ 116.

In response, on March 24, 2025, Abrego Garcia filed suit in this Court and separately moved for an injunction directing Respondents to secure his immediate release from CECOT and his return to the United States. *Abrego I*, ECF Nos. 1 & 2. On April 4, 2025, the Court granted such relief, ordering Respondents[4] to "facilitate and effectuate" his return to the United States. *Abrego I*, ECF No. 21 at 2. Respondents appealed, and within days, the United States Court of

[4] Respondents were also Defendants in *Abrego I*, along with the Department of State and Secretary Marco Rubio. *Abrego I*, ECF No. 31. The same legal team represents Respondents and Defendants in both actions.

Appeals for the Fourth Circuit and the Supreme Court affirmed the order as modified to command facilitation of Abrego Garcia's return "to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador." *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025); *see also Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *1 (4th Cir. Apr. 7, 2025).

In the ensuing weeks, Respondents refused to facilitate Abrego Garcia's release or his return.[5] However on June 6, 2025, Respondents paroled[6] Abrego Garcia to the United States after securing a federal indictment in the Middle District of Tennessee, a matter that is itself under scrutiny for vindictive and selective prosecution. *See United States v. Abrego Garcia,* 3:25-cr-00115-1 (M.D. Tenn.) ("*Tennessee Criminal Matter*"), ECF Nos. 3 & 104.

Once in criminal custody, and after several hearings, Abrego Garcia was released on stringent conditions of supervision. *See Tennessee Criminal Matter*, ECF Nos. 43, 44, 55, 95 & 96. But Respondents found this result intolerable and complained bitterly.[7] Respondents also

---

[5] *See Abrego I*, ECF No. 211-16 (April 18, 2025, White House post announcing Abrego Garcia "is NOT coming back," and "is never coming back" from El Salvador) (emphasis in original); *Abrego I*, ECF No. 211-17 at 13 (April 25, 2025, Time Magazine interview with President Trump wherein he confirmed he has not asked the President of El Salvador to release and return Abrego Garcia); *Abrego I*, ECF No. 211-19 at 2 (May 2, 2025, DHS post confirming Abrego Garcia "will never be allowed to return to the United States"). *See also* Karina Tsui, *Trump says he 'could' bring Abrego Garcia back from El Salvador, but won't*, CNN (May 1, 2025), https://www.cnn.com/2025/04/30/us/trump-could-bring-abrego-garcia-back-us-hnk.

[6] When Respondents returned Abrego Garcia, they granted him significant public benefit parole pursuant to 8 C.F.R. § 212.5, which remains valid through June 4, 2026. ECF No. 1 ¶ 34; ECF No. 6 at 2. Notably, such parole is conferred "for urgent humanitarian reasons or significant public benefit" to a noncitizen "applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). *See also Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018); USCIS website defining "Humanitarian or Significant Public Benefit Parole", as permission for "an individual, who may be inadmissible or otherwise ineligible for admission into the United States, to be paroled into the United States for a temporary period." *Humanitarian or Significant Public Benefit Parole for Aliens Outside the United States*, U.S. CITIZENSHIP AND IMMIGR. SERV., https://www.uscis.gov/humanitarian/humanitarian_parole (last visited Dec. 10, 2025). Less clear is how it could ever apply to a noncitizen with a final order of removal. *See* discussion *infra* Sections IV. A–B.

[7] *See, e.g.*, *Tennessee Criminal Matter*, ECF No. 98 at 2 (quoting DHS on X); DHS (@DHSgov), X, *This is a LAWLESS judge. This MS-13 gang member, human trafficker and illegal alien will never walk America's streets again.* (July 23, 2025, at 4:32 ET), https://x.com/DHSgov/status/1948119106785362028; Gary Grumbach & Matt Lavietes, *Judge pauses Kilmar Abrego Garcia's release from federal custody,* NBC (July 23, 2025), https://www.nbcnews.com/news/us-news/judge-orders-kilmar-abrego-garcia-released-federalcustody-rcna217953 (DHS spokesperson, Tricia McLaughlin, stating "It will be a cold day in hell before this criminal illegal alien is back

warned Abrego Garcia that upon his release, ICE would take him into its custody to effectuate his removal to a country other than El Salvador. *See Abrego I*, ECF No. 203 at 1; ECF No. 210 at 10.

Abrego Garcia, in response, urged the Court to order his return to Maryland under the ICE supervision terms that were in effect prior to his wrongful removal. *Abrego I*, ECF No. 210 at 10. The Court agreed and ordered Abrego Garcia's release and return to ICE supervision out of the Baltimore Field Office. *Abrego I*, ECF No. 239. The Court also ordered that in the event Respondents initiated third-country removal proceedings, they give Abrego Garcia 72 hours' notice of the intended third country. *Id.*

Meanwhile, during plea negotiations in the criminal case, Costa Rica offered to grant Abrego Garcia residency as a refugee. ECF No. 1-3; ECF No. 1-7; *Tennessee Criminal Matter*, ECF No. 114-1. Official correspondence dated August 21, 2025, from Costa Rica's Minister of Public Security Mario E. Zamora Cordero ("Zamora Cordero"), confirmed:

> The Government of Costa Rica intends to provide refugee status or residency to Mr. Abrego Garcia upon his transfer to Costa Rica. The Government of Costa Rica assures the Government of the United States of America that, consistent with that lawful immigration status and Costa Rican law, it does not intend to detain Mr. Abrego Garcia upon his arrival in Costa Rica.
>
> The Government of Costa Rica further assures the Government of the United States of America that it will not remove Mr. Abrego Garcia to any third country, including Mr. Abrego Garcia's home country, without Mr. Abrego Garcia's consent.

ECF No. 1-3.

---

on American streets."); U.S. DEP'T OF HOMELAND SEC., *Secretary Noem to Host Press Conference Exposing "Worst of the Worst" Criminal Illegal Aliens in TN*, at 14:26–14:50 (YouTube, July 18, 2025), https://www.youtube.com/watch?v=6J0-YouvMGo. *See also* Tricia McLaughlin (@TriciaOhio), X, *Kilmar Abrego Garcia is a dangerous criminal illegal alien. We have said it for months and it remains true to this day: he will never go free on American soil.* (June 22, 2025, 7:31 ET), https://x.com/TriciaOhio/status/1936929967423754665; NEWSMAX, *Abrego Garcia Won't Be on U.S. Soil Much Longer: Tricia McLaughlin,* at 4:10–5:00 (YouTube, June 27, 2025), https://www.youtube.com/watch?v=tqOiNZ8jD58 ("[T]his is a man who should not be on U.S. soil for long and won't be.").

The next day, on August 22, 2025, as Abrego Garcia left the detention center in Tennessee, Respondents served him with a Notice to Appear to the Baltimore ICE Field Office the following Monday. ECF No. 1-4. Respondents separately notified his counsel that they intended to remove Abrego Garcia to Uganda. ECF No. 1-5. Abrego Garcia immediately responded with written notice to Respondents of his fear that if sent to Uganda, he would face persecution, torture and ultimate refoulment to El Salvador. ECF No. 1 ¶ 41; ECF No. 1-6. He also separately notified Respondents in writing that Costa Rica was "the country to which I want to be removed." ECF No. 1-7.

Abrego Garcia next appeared at the Baltimore ICE Field Office as directed on August 25, 2025. ECF No. 6 at 2. He was immediately taken into ICE custody, and according to DHS Secretary Noem, he was "being processed for removal to Uganda" instead of Costa Rica. ECF No. 32-14 at 2.

Abrego Garcia, in turn, filed the Petition pursuant to 28 U.S.C. § 2241, contending that his removal to Uganda violates 8 U.S.C. § 1231(b)(2) and (b)(3) of the INA; that Respondents' third-country removal policy deprives him of procedural and substantive due process; and that his detention is without lawful authority in the absence of a valid removal order. ECF No. 1. The Petition also challenged the constitutionality of Abrego Garica's continued detention pursuant to 8 U.S.C. § 1231(a)(6) under *Zadvydas v. Davis*, 533 U.S. 678 (2001), because "[n]o significant likelihood of removal in the reasonably foreseeable future exists," thereby undercutting any claim that he was being detained for the purpose of third-country removal. ECF No. 1 ¶¶ 51–57 ("the *Zadvydas* claim"). The Court set a briefing schedule on the Petition and an evidentiary hearing for October 6, 2025. ECF No. 20.

In the days that followed, Respondents took no steps to "process" Abrego Garcia for removal to Uganda, ostensibly because of his claimed fear of persecution and torture in that country. ECF No. 24 at 19–20; ECF No. 28 at 17; ECF No. 52 at 219:11–15. Instead, on September 5, 2025, Respondents notified Abrego Garcia's counsel that they now would remove him to the South African country of Eswatini. ECF No. 27-3. Abrego Garcia immediately asserted fear of removal to Eswatini on similar grounds. ECF No. 57-1 at 3.

Within days, Eswatini learned of Respondents' notice to Abrego Garcia and it bit back. On September 11, 2025, Eswatini's spokesperson, Thabile Mdluli, announced that "the Government of Eswatini ha[d] not received any communication regarding this person," and did not have any agreement with the United States to receive Abrego Garcia. ECF No. 32-6 at 2. Respondents also had not done anything with Abrego Garcia's credible fear assertions, or communicated whether he would receive similar refugee or other status in Eswatini or be protected from persecution or torture. ECF No. 27 at 4–5.

Having heard nothing, and with the October 6 hearing approaching, Abrego Garcia asked the Court to order targeted discovery on the Respondents' plans to remove him to either Uganda or Eswatini in lieu of Costa Rica. ECF No. 27 at 6. Respondents, for their part, asked to continue the evidentiary hearing. ECF No. 30 at 3. So, the Court converted the evidentiary hearing to an in-person status conference. ECF No. 31.

At the conference, the Court tried to assess whether Respondents had made any real effort toward removing Abrego Garcia in conformity with *Zadvydas*. ECF No. 44. It quickly became clear they had not. Respondents, through counsel, could say no more than "Eswatini" has been "selected" for Abrego Garcia's removal. ECF No. 48 at 17:12–14. But they had no information about whether Respondents had even asked Eswatini about the same. Nor did Respondents have

any further details about whether any efforts had been made to secure removal to Costa Rica. *Id.* at 29:25–30:4. This was so even though Abrego Garcia reaffirmed that he would depart "this afternoon" for Costa Rica, thus obviating the need for any further hearings or adjudication of this Petition. *Id.* at 30:3–7, 29:11–12 (Simon Sandoval-Moshenberg, counsel for Abrego Garcia, stating, "If the government's goal is to effectuate the removal, he would be in Costa Rica right now as we speak.").[8]

Because Respondents had done nothing—other than send emails to Abrego Garcia's lawyers about removal to Uganda and Eswatini—Abrego Garcia asked that the Court rule expeditiously on the *Zadvydas* claim. ECF No. 48 at 26:9–13. Respondents, in turn, asked for an evidentiary hearing to demonstrate the sincerity of their third-country removal efforts. ECF No. 48 at 30:14–19. The Court granted their request and specifically ordered Respondents to produce a witness or witnesses to testify about "what steps, if any, Respondents have taken to remove Petitioner to Eswatini or any other country, including but not limited to, Costa Rica," and "what additional steps, if any, Respondents will take in the reasonably foreseeable future to remove Petitioner to Eswatini or any other country, including but not limited to, Costa Rica." ECF No. 47 at 1–2.

The Court held an evidentiary hearing four days later, on October 10, 2025. ECF No. 50. Respondents produced one witness, Deputy Assistant Director of ICE Enforcement and Removal Operations, John Schultz ("Schultz"). ECF No. 52 at 13:3–9. Contrary to the Court's order, Schultz was not prepared *at all* to discuss Costa Rica's offer to accept Abrego Garcia as a refugee. Schultz candidly admitted he had not even seen Costa Rica's August 21, 2025, correspondence,

[8] Despite the intense global attention paid to this case and the purpose of the status hearing, counsel for Respondents came to this hearing supposedly unaware of any removal efforts pertaining to Abrego Garcia. Even with a recess, counsel still could not "reach anyone that could provide an answer." ECF No. 48 at 30:14–33:4.

and he had "no knowledge" about whether the Respondents had done anything to commence removal proceedings to Costa Rica. *See id.* at 84:24–85:1, 101:8–14 & 106:19–24.

Next as to Uganda, Schultz testified that Respondents had asked Uganda to take Abrego Garcia, but it "ultimately said no." ECF No. 52 at 134:16–22. As to Eswatini, Schultz testified that Respondents had not formally asked Eswatini to accept Abrego Garcia until the Wednesday night *before* the Friday evidentiary hearing. ECF No. 52 at 56:13–21 ("Q: So the United States had not asked Eswatini to accept Mr. Abrego until this past Wednesday? Schultz: Your Honor, I don't know what occurred in, say, September. That was before the notification that Eswatini was the country. I just know that a request was made Wednesday evening to Eswatini. Q: But you have no other information of prior requests? Schultz: No, Your Honor."). Schultz also reported that even though Eswatini "said no," "the conversations weren't over." *See id.* at 29:6–11, 54:23–25 & 56:5–7.

Schultz further confirmed that the night before the hearing, Respondents notified Abrego Garcia's counsel that he would now be removed to yet a third African country, Ghana. ECF No. 52 at 32:11–19, 156:3–25. But once this purported designation to Ghana became public, Ghanian Foreign Minister, Sam Okudzeto Ablakwa, immediately announced that "Ghana [was] not accepting Abrego Garcia. He cannot be deported to Ghana," and that this position "has been directly and unambiguously conveyed to U.S. authorities." ECF No. 49-1. *See also* Maxwell Nyagamago, *'Ghana is not accepting Abrego Garcia,' – Ablakwa denies reports*," PULSE (Oct. 10, 2025), https://www.pulse.com.gh/story/ghana-is-not-accepting-abrego-garcia-ablakwa-denies-reports-2025101014063418514.

Schultz ultimately confirmed that he knew of no impediment to remove Abrego Garcia to Costa Rica, including no statement from Respondents that effectuating such removal would run

contrary to "U.S. interests." ECF No. 52 at 105:12–15. Schultz further attested that he had been told nothing about why Respondents had not yet processed Abrego Garcia's removal to Costa Rica. *Id.* at 105:16–22, 106:11–24. Counsel for Abrego Garcia, in turn, emphasized that his client's continued detention must be for purposes other than facilitating removal because if Respondents "want to remove him to Costa Rica, you will hear no objection from us . . . . They can put him on the next plane to Costa Rica." ECF No. 107 at 78:1–5. *See also* ECF No. 52 at 184:5–12.

Indeed, in oral argument, Respondents' counsel acknowledged that the only legitimate ground to hold Abrego Garcia was to effectuate removal. ECF No. 52 at 213:15–18 ("[I]t's clear that it's detention for a removal."). And yet, they had no answers as to why the "policymaker[s]" eschewed Costa Rica. *Id.* at 206:16–18. The best they could do was "stipulate" that "Costa Rica is on the table if Eswatini falls through." *Id.* at 107:8–10.[9]

The Court concluded the hearing by announcing it would reach the *Zadvydas* claim expeditiously. But before the Court could formally rule, Respondents notified Abrego Garcia and the Court on October 24, 2025, that now they intended to remove him to yet a fourth African country, Liberia. ECF No. 56. Liberia evidently agreed to accept Abrego Garcia on a "strictly humanitarian" and "temporary" basis, with promises to not to persecute, torture or refoul him. *Id.*; ECF No. 72-6 at 3.

The Court convened a status conference after the Liberia notice, during which Abrego Garcia requested one final hearing to address the remaining counts of his Petition. ECF No. 64. at 9:3–15. Respondents posed no objection and indicated they would separately move for this Court

[9] The Court does not credit Respondents' contention that Abrego Garcia had claimed fear of removal to Costa Rica. ECF No. 52 at 206:16–24. Abrego Garcia's counsel admitted he had mistakenly included Costa Rica on a blanket fear assertion that named several other countries. ECF No. 52 at 188:14–189:2. Abrego Garcia also has confirmed in writing, and repeatedly through counsel, his consent to be removed to Costa Rica without delay. The Court credits this evidence.

to dissolve its temporary prohibition on removing Abrego Garcia from the continental United States.[10] *Id.* at 13:10–15. The Court allowed supplemental briefing and set a hearing for the following month. *Id.* at 18:12–24.

In their subsequent filings, Respondents justified removing Abrego Garcia to Liberia because it was "the only state" willing to accept him. ECF No. 75-6 ¶ 6. They told the Court that Costa Rica "does not wish to receive" Abrego Garcia any longer, and that Costa Rica "would not simply accept" Abrego Garcia. ECF No. 85 at 9 & 14. Thus, said Respondents, "they can hardly be at fault for not removing Petitioner to *a country that refuses to accept him*." *Id.* at 14 (emphasis added). Respondents also attached the sworn Declaration of ICE Acting Assistant Director for the Removal Division, Johnathan Cantú ("Cantú"), as purported evidence of Costa Rica's change of heart (the "Cantú Declaration"). ECF No. 75-6.

Oddly, however, Respondents submitted their memoranda and the Cantú Declaration under seal[11] and moved to seal the evidentiary hearing entirely. ECF No. 91. This represented a sharp departure from their prior practice to seal only that which is necessary to protect diplomatic communications as typically memorialized in a diplomatic note or memorandum of understanding. *See, e.g.*, ECF Nos. 73-7 & 75-3; *Abrego I*, ECF No. 141. Respondents also did not attach any communication from Costa Rica reflecting any recission or modification of its prior offer to receive Abrego Garcia as a refugee.

[10] Given that Respondents had once illegally removed Abrego Garcia, the Court had ordered Respondents not to remove Abrego Garcia from the United States absent further order of the Court. ECF Nos. 13 & 20. The Court also made plain that at any time, Respondents could move for dissolution of the injunction if it presented an impediment to expeditious removal. *See, e.g.*, ECF No. 24 at 15:7–9; *id.* at 21:4–11. Nonetheless, at points, counsel for Respondents tried to blame the injunction as imposing some chimeric obstacle to their removal efforts. This misdirection failed, as the Court was always clear that once actual removal was underway, if taken consistently with the INA and due process, the Court would dissolve the injunction upon Respondents' motion. *See, e.g.*, ECF No. 52 at 34:3–37:12.

[11] Filings that are accompanied by a motion to seal are provisionally sealed pending resolution of the sealing motion. *See* D. Md. Loc. R. 105.11.

Abrego Garcia quickly asked the Court to make Cantú available for testimony. ECF Nos. 81 & 82. The Court granted that motion over the Respondents' vigorous objection. ECF No. 92 at 12:18–13:20. The Court also unsealed the relevant filings and ordered the Respondents and their lawyers to prepare the witness in good faith to answer questions about Costa Rica's willingness to accept Abrego Garcia. ECF Nos. 90, 94 & 95.

At the hearing on November 20, it became evident that once again, Respondents defied this Court's orders.[12] They simply refused to prepare and produce a witness with knowledge to testify in any meaningful way. Cantú candidly admitted, for example, that he had no prior involvement in Abrego Garcia's case and spent approximately five minutes preparing to testify. *See* ECF No. 107 at 33:3–4, 39:5–9. Cantú also shared that none of Respondents' attorneys had discussed this Court's order with him or showed him its contents. *See id.* at 42:1–24. Nor did Cantú understand the purpose of his testimony. *Id.*

Then at the hearing, Respondents showcased Cantú's ignorance about the content of his Declaration pertaining to Costa Rica. As the pointed questions of Respondents' counsel made clear, Cantú's lack of knowledge was planned and purposeful.

> Counsel: So paragraph 4, final sentence [of the Cantú Declaration], do you see where it says the word—the words "certain understandings"?
>
> Cantú: I found it. Yes, I do. I see it.
>
> Counsel: What are the certain understandings referenced in the last sentence?
>
> Cantú: I don't know . . .

---

[12] Cantú is *the sixth witness* whom the Court directed Respondents to prepare for either deposition or in-court testimony concerning this case. *See, e.g., Abrego I*, ECF Nos. 117 & 146 (collecting testimony of three deponents); ECF No. 234 at 36:23–39:9 (Giles testimony); *see also* ECF No. 52 at 108:3–17 (Schultz testimony); ECF No. 107 at 42:2–25 (Cantú testimony). Each witness was either unprepared or defiant in their refusal to answer questions. The Court will consider the entire course of conduct when it reaches the motions pending in *Abrego I.*

Counsel: What are the "contingencies" referenced in the last sentence?

Cantú: I do not know . . .

Counsel: What are the "interim developments" referenced in paragraph 5?

Cantú: I don't know.

ECF No. 107 at 26:8–27:12 (counsel for Respondents, Jonathan Guynn ("Guynn"), questioning Cantú). *See also id.* at 53:8–9 (Guynn, at sidebar with Court, stating "I'll just say I told you this was exactly what was going to happen," regarding the witness' ignorance on Costa Rica as a viable country of removal).

Ultimately, Respondents' calculated effort to take Costa Rica "off the table" backfired. Within 24 hours, Costa Rica, through Minister Zamora Cordero, communicated to multiple news sources that its offer to grant Abrego Garcia residence and refugee status is, and always has been, firm, unwavering, and unconditional. *See* ECF No. 108 at 1. *See also* Maria Sacchetti, *Costa Rica says it would accept Kilmar Abrego García, contradicting U.S.*, WASH. POST (Nov. 21, 2025), https://www.washingtonpost.com/immigration/2025/11/21/kilmar-trump-deport-costarica/ (Zamora Cordero stating that Costa Rica would receive Abrego Garcia "under humanitarian conditions that guarantee the full respect for his rights and liberties . . . . That position that we have expressed in the past remains valid and unchanged to this day."); Laura Romero, *Costa Rican official says country willing to accept Abrego Garcia, contradicting Trump administration officials*, ABC NEWS (Nov. 21, 2025), https://abcnews.go.com/International/costa-rican-official-country-accept-abrego-garcia-contradicting/story?id=127775855, (Zamora Cordero confirming that "Costa Rica's offer to receive Mr. Abrego Garcia for humanitarian reasons remains in place . . . . My letter dated August 25, 2025 [sic], is the official position of the government."). Respondents have sat mum since.

## II. Abrego Garcia's Requested Relief

Despite this tortured history, Abrego Garcia's arguments in favor of release are quite simple. He contends that his detention is without lawful authority because Respondents have no final order of removal authorizing as much under the third-country removal statute, 8 U.S.C. § 1231. Thus, says Abrego Garcia, his release is compelled. ECF No. 1 ¶¶ 51–57, 68–69. Alternatively, Abrego Garcia maintains that Respondents' steadfast refusal to remove him to Costa Rica amidst constant threats of removal to a series of African countries that expressed no or limited desire to take him can only be construed as punitive and contrary to the purposes of ICE detention. ECF No. 71 at 6 & 17.

Respondents' central retort is that this Court lacks jurisdiction to reach the Petition at all. Accordingly, the Court first addresses whether it retains jurisdiction to reach the claims.

## III. Jurisdiction

Respondents contend the Court lacks subject matter jurisdiction pursuant to three provisions of the INA, 8 U.S.C. §§ 1252(g), (a)(5) and (b)(9). *See* ECF Nos. 28 & 72. Each is easily disposed.

First, as to 8 U.S.C. § 1252(g), this provision bars this Court from hearing three discrete kinds of claims "arising from" an action of the Attorney General "to commence proceedings, adjudicate cases, or execute removal orders against any [noncitizen] under this chapter." *See Reno v. American Arab Anti–Discrimination Comm.,* 525 U.S. 471, 485 n.9 (1999). Abrego Garcia's Petition does not challenge the commencement of proceedings or adjudication of any case. Accordingly, the only conceivable argument for which § 1252(g) strips the Court of jurisdiction is that the Petition challenges the "execution of a removal order."

But Abrego Garcia does not challenge the *execution* of a removal order. Instead, he contends that his detention is unlawful and not reasonably foreseeable because he is held in the *absence* of such a removal order. Thus, Abrego Garcia's request for immediate release cannot touch upon the execution of a removal order if no such order exists. *See, e.g.*, *Madu v. U.S. Att'y. Gen.*, 470 F.3d 1362, 1367–68 (11th Cir. 2006) (holding a district court retains jurisdiction over a § 2241 habeas petition challenging detention based on the lack of a removal order and finding that challenge distinct from the challenge to the "execution" of a removal order as barred under § 1252(g)); *cf. Kumarasamy v. Att'y Gen. of U.S.*, 453 F.3d 169, 172 (3d Cir. 2006), *as amended* (2006) (holding district court retains jurisdiction to reach § 2241 petition because petitioner's challenge to detention absent an order of removal did not deprive court of jurisdiction under 8 U.S.C. § 1252(a)(5)); *Rivas-Melendrez v. Napolitano*, 689 F.3d 732, 737 (7th Cir. 2012) (recognizing jurisdictional distinction between "a challenge to a removal order and an argument that no order of removal even existed to be executed.").[13]

Second, and for similar reasons, neither 8 U.S.C. §§ 1252(a)(5) nor (b)(9) bar this Court's power to adjudicate the Petition. Sections 1252(a)(5) and (b)(9) were enacted to "eliminate[] habeas review over all final orders of removal," *A. Singh v. Gonzales*, 499 F.3d 969, 977 (9th Cir. 2007), by channeling such challenges directly to the "appropriate court of appeals . . . [as] the sole and exclusive means for judicial review of an order of removal . . . ." *Id*. (quoting 8 U.S.C. § 1252(a)(5)). *See also* § 1252(b)(9) (channeling "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove a [noncitizen] from the United States under this subchapter" as "available only in judicial review of a final order under this section"). But again,

[13] The Court similarly retains jurisdiction over Petitioner's *Zadvydas* claim. *See Zadvydas*, 533 U.S. at 688–89.

Abrego Garcia is not challenging a final order of removal. He argues instead that his detention lacks lawful authority because there is no such order. *See A. Singh*, 499 F.3d at 978 ("By virtue of their explicit language, both §§ 1252(a)(5) and 1252(b)(9) apply only to those claims seeking judicial review of orders of removal."). In this important respect, "the question presented by [the habeas petition] is whether there is a removal order at all," which is different than "whether an extant removal order is lawful." *Madu*, 470 F.3d at 1367 (citing *Kumarasamy,* 453 F.3d at 172). Because the Petition, at bottom, turns on the *absence* of a removal order, the channeling provisions simply "do[] not apply." *Madu*, 470 F.3d at 1368. *See also Kumarasamy*, 453 F.3d at 172; *Nadarajah v. Gonzales*, 443 F.3d 1069, 1075–76 (9th Cir. 2006) ("By its terms, the jurisdiction-stripping provision does not apply to federal habeas corpus petitions that do not involve final orders of removal. Here, as we have noted, there is no final order of removal . . . . Therefore, in cases that do not involve a final order of removal, federal habeas corpus jurisdiction remains in the district court, and on appeal to this Court, pursuant to 28 U.S.C. § 2241."). *Cf. Zadvydas*, 533 U.S. at 688 ("We conclude that § 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention."); *Jennings v. Rodriguez,* 583 U.S. 281, 293 (2018) (rejecting expansive interpretation of § 1252(b)(9) as applied to claims of "prolonged detention").

For these reasons, the Court retains jurisdiction to reach Abrego Garcia's arguments because none concern the review of a removal order.[14] The Court next turns to the merits of Abrego Garcia's grounds for relief.

[14] Respondents' two remaining jurisdictional arguments focus on Abrego Garcia's subsidiary due process challenge to Respondents' policy concerning third-country removal procedures, *citing* 8 U.S.C. § 1252(a)(4), the Foreign Affairs Reform and Restructuring Act of 1998 § 2242(d) (codified as Note to 8 U.S.C. § 1231) and 8 U.S.C. § 1252(a)(2)(B)(ii). ECF No. 72 at 27–28. *See also* ECF No. 28 at 12 n.2. The Court need not reach these jurisdictional questions because it grants the petition on other grounds.

## IV. Merits of the Petition

Throughout, Abrego Garcia has maintained that no order of removal exists for him. ECF No. 1 ¶¶ 54, 68–69; ECF No. 32 at 10 & 32; ECF No. 87 at 11. Although the proceedings until now have not squarely depended on adjudicating this most basic fact, the time has come. To understand why, the Court first explains what a removal order is, and is not, as a matter of law; and next, why the Court finds no such order exists for Abrego Garcia. Last, the Court discusses why the absence of such order compels his release.

### A. What is a Removal Order Under the INA

An order of removal is the vehicle by which the Executive branch retains the power conferred by Congress under the INA to remove a noncitizen from the United States against his will. *See* 8 U.S.C. § 1231(a)(1)(A). Such power is tantamount to an order of deportation, defined as "an *order* 'concluding that the [noncitizen] is deportable or ordering deportation.'" *Riley v. Bondi*, 606 U.S. 259, 267 (2025) (quoting 8 U.S.C. § 1101(a)(47)(A)) (emphasis added). *See also Nasrallah v. Barr*, 590 U.S. 573, 584 (2020) (citing 8 U.S.C. § 1101(a)(47)(A)) (holding that under the INA, in the deportation context, a "final order of deportation is now defined as a final order 'concluding that the [noncitizen] is deportable or ordering deportation.'").

An order of removal must be "explicit" in its directive that a noncitizen is to be removed to an identified country or countries. *Kouambo v. Barr*, 943 F.3d 205, 210 (4th Cir. 2019) (quoting *Matter of I-S- & C-S-*, 24 I. & N. Dec. 432, 434 (BIA 2008)). Further, where, as here, "an Immigration Judge issues a decision granting a [noncitizen's] application for withholding of removal . . . the decision must include an explicit order of removal." *Matter of I-S- & C-S-*, 24 I. & N. Dec. at 432. This is so because when a noncitizen receives protection from removal to an identified country, the predicate removal order takes on special importance.

As Judge Wilkinson ably explained in *Kouambo v. Barr*, the existence of a removal order is fundamental to determining whether, and to where, a noncitizen may be removed:

> First, as a matter of simple logic, 'in order to withhold removal, there must first be an order of removal that can be withheld' . . . . Second, because a [noncitizen] protected by an order of withholding may still be removed to a willing third country, the IJ must issue a final order of removal to authorize DHS to effect such a removal if a third country is identified.

943 F.3d at 210 (quoting *Matter of I-S- & C*-S-, 24 I. & N. Dec. at 433). Thus, an order of removal *must* "identify a country, or countries in the alternative to which the [noncitizen's] removal may in the first instance be made, pursuant to the provisions of section 241(b) of the Act." 8 C.F.R. § 1240.12(d).

### B. No Order of Removal Exists for Abrego Garcia

No such order of removal exists for Abrego Garcia. When Abrego Garcia was first wrongly expelled to El Salvador, the Court struggled to understand the legal authority for even seizing him in the first place. At the first hearing in *Abrego I*, the Court inquired of Respondents' counsel:

> The Court: I want to ask, though, the very specific question, if there is a final order of removal, what . . . document got this process started? There is no warrant for his arrest by an order of removal. There is no statement of probable cause. There's no charge. There's no report that says that anyone saw Mr. Abrego Garcia doing anything illegal or criminal. So what is the actual document that gave these officers the authority to start this process?
>
> Counsel: That is not in the record, and the government has not put that into the record. And that's the best I can do.

*Abrego I*, ECF No. 33 at 21:11–22.

The Court continued to press counsel about the existence of a removal order and was told plainly that none can be found:

The Court: Okay. So if there's a Title 8 removal order, there would be an order of removal that's being executed, and we don't have one for Mr. Abrego Garcia, right? . . . Do you have that order? . . . Is it in the record?

Counsel: I do not have that order. It is not in the record.

*Id.* at 23:7–24:4.

Since that time, Respondents have never produced an order of removal despite Abrego Garcia hinging much of his jurisdictional and legal arguments on its non-existence. ECF No. 1 ¶¶ 68–69; ECF No. 32 at 10, 15–17, 27; ECF No. 87 at 11–12. Indeed, Respondents twice sponsored the testimony of ICE officials whose job it is to effectuate removal orders, and who candidly admitted to having never seen one for Abrego Garcia. *See* ECF No. 107 at 30:16–22 (testimony of Cantú) ("Q: Based upon your many years of experience you described to us, you know what a final order of removal looks like, right, sir? Cantú: I do. Q: And have you seen a final order of removal in regard to Mr. Abrego Garcia? Cantú: I have not."). *See also Abrego I*, ECF No. 234 at 46:6–12 (testimony of interim Assistant Director for ICE Removal Operations, Thomas Giles ("Giles")) ("Q: You have not seen the final order of removal, have you, sir? Giles: What do you mean by that? Q: I mean, you have not seen a piece of paper that represents the final order of removal vis-a-vis Mr. Abrego Garcia, correct? Giles: No, I have not.").[15] Based on this, the Court concludes that no order of removal exists.

Respondents do not contend otherwise. Instead, they urge the Court to construe the October 10 withholding decision as an *implied* order of removal, or one that exists "by operation

[15] Additionally, the ICE Immigration detainer for Abrego Garcia dated June 6, 2025, and first made part of the record in *Abrego I*, corroborates that no final order of removal exists. ECF No. 32-1. The detainer includes a preprinted section articulating the "probable cause" for believing the "subject is a removable individual" because of *either* the existence of a "final order of removal against the individual" *or* "[t]he pendency of ongoing removal proceedings against the individual." ECF No. 32-1 at 2. The ICE officer checked the box for "pendency" of proceedings even though nothing was "pending" at the time. *Id.* More to the point, the ICE officer did not check that detention was based on the existence of a final order of removal. *Id.*

of law." ECF No. 107 at 111:11–20. They essentially argue that because an IJ would not grant withholding of removal absent a valid order of removal, then the Court can read into the withholding decision the existence of a removal order. *Id.* While this argument may have some intuitive appeal, it belies both the facts of this case and the long-established precedent which commands against collapsing two legally distinct orders—removal and withholding of removal—into one.

The October 10 withholding decision is unambiguously *not* an order of removal. It does not "order" Abrego Garcia removed to any country or designate removal to alternative countries, as required under the INA. *See Nasrallah*, 590 U.S. at 579 (an order of removal is "an order 'concluding that the [noncitizen] is deportable or ordering deportation.'") (citing 8 U.S.C. § 1101(a)(47)(A)). *See also* 8 C.F.R. § 1240.12(d). Nowhere in the October 10 withholding decision does the IJ order Abrego Garcia removed to El Salvador or anywhere else.

Nor can the Court conclude legally that a removal order is "implicit" in the October 10 withholding decision, as Respondents urge. The Fourth Circuit has made clear, "when an IJ grants withholding of removal, an *explicit* order of removal must be included in the decision," that identifies the country to which the noncitizen may be removed and alternative countries. *Kouambo*, 943 F.3d at 210 (internal quotation marks and citation omitted). It is this explicit designation that "authorizes DHS to effectuate such a removal if a third country is identified." *Id.* *See also Matter of I-S- & C-S-*, 24 I. & N. Dec. at 434 ("We find that the proceedings in this case are unresolved and incomplete because the Immigration Judge found the respondents removable and granted their application for withholding of removal but failed to order them removed."); *cf.* *Bracic v. Holder*, 603 F.3d 1027, 1032–33 (8th Cir. 2010). Because the October 10 withholding

decision does not order Abrego Garcia removed to any country, it is simply *not* an order of removal.

Moreover, to conclude as the Respondents suggest—that the withholding order is also the order of removal—would contravene well established Supreme Court precedent directing otherwise. Consider first *Nasrallah v. Barr*, 590 U.S. 573 (2020). There, the Court held that for jurisdictional purposes under the INA, a final order of removal cannot "merge" with a withholding order. *Nasrallah*, 590 U.S. at 583. The *Nasrallah* Court reasoned that withholding relief under CAT cannot be construed as a final order of removal because the withholding order itself does not conclude "the [noncitizen] is deportable or ordering deportation." *Id.* at 579. Rather, a withholding order "means only that, notwithstanding the order of removal, the noncitizen may not be removed to the designated country of removal, at least until conditions change in that country." *Id.* at 582. For this reason, the *Nasrallah* Court concluded:

> A CAT order may be reviewed together with the final order of removal. But a CAT order is distinct from a final order of removal and does not affect the validity of the final order of removal. The CAT order therefore does not merge into the final order of removal for purposes of [the Court's jurisdictional limitation on the scope of judicial review].

*Id.* at 583.

The following year, the Court in *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021) was called to answer, among other questions, whether an order of removal becomes final at the point the removal order issues, or later, when the noncitizen's withholding-only proceedings conclude. The Court held the former, because:

> [R]emoval orders and withholding-only proceedings address two distinct questions. As a result, they end in two separate orders, and the finality of the order of removal does not depend in any way on the outcome of the withholding-only proceedings.

*Id.* at 539.

Last, just a few months ago, the Court in *Riley v. Bondi,* 606 U.S. 259 (2025) reaffirmed that "the lessons taught by *Nasrallah* and *Guzman Chavez* are clear." 606 U.S. at 269. In concluding that an order from Board of Immigration Appeals ("BIA") that vacated the grant of CAT relief was not a final order of removal, the *Riley* Court emphasized that the BIA order simply did not "affect the validity of a previously issued order of removal or render that order non-final." *Id*. Because removal orders remain legally distinct from subsequent denials of relief, the final removal order "does not depend" on the outcome of the withholding proceedings. *Id.* (quoting *Guzman Chavez*, 594 U.S. at 539). This is so even though this construction invites procedural difficulties in streamlined appellate review of both the removal order and the withholding decision. *Id.* at 271–72.

Read together, *Nasrallah, Guzman Chavez,* and *Riley* foreclose the Respondents' "implicit" removal-order theory. Each confirms that an order of removal retains separate legal vitality. It must be an *order* "concluding that the [noncitizen] is deportable or ordering deportation." *Nasrallah*, 590 U.S. at 579 (quoting 8 U.S.C. § 1101(a)(47)(A)). *See also Riley*, 606 U.S. at 278. It must also identify the country or countries to which the noncitizen is ordered removed. 8 C.F.R. § 1240.12(d). Absent an order to this effect, the Court cannot simply infer that the withholding decision does the trick, as "removability and withholding relief are distinct." *Guzman Chavez*, 594 U.S. at 537.

For the same reasons, the Court also rejects Respondents' entreaties to construe the "procedural history" section of the October 10 withholding decision as an order of removal. ECF No. 72 at 17. True, the procedural history section reflects that at some point earlier, Abrego Garcia "through counsel . . . conceded removability as charged," and that "[b]ased on the Respondent's admissions and concessions, the Court found his removability to be established by clear and

convincing evidence as required by INA 240(c)(3)." ECF No. 1-1 at 2. But nowhere does the IJ *order* Abrego Garcia removed to any country at all. *See* 8 C.F.R. § 1240.12(d) (a removal order must "identify a country, or countries in the alternative, to which the [noncitizen's] removal may in the first instance be made, pursuant to the provisions of section 241(b) of the Act."). *See also Guzman Chavez*, 594 U.S. at 536. Thus, to credit this argument, the Court would have to collapse two legally distinct orders into one. This the Court cannot do. *Id.* at 537.

Because no order of removal exists, the Court turns next to why detention in the absence of such an order cannot continue.[16]

### C. Continued Detention Without a Removal Order Violates the INA and Due Process

The absence of a removal order raises an intractable problem for Respondents. They took Abrego Garcia into ICE custody with the singular purpose of removing him to a third country pursuant to 8 U.S.C. § 1231. *See* ECF No. 1-5 (notice of removal to Uganda); ECF No. 27-3 (notice of removal to Eswatini); ECF No. 52 at 32:18–19 (confirming notice of removal to Ghana sent "prematurely" to Abrego Garcia's counsel); ECF No. 56 (notice of removal to Liberia). *See also* ECF No. 28 at 18 (Respondents arguing their third-country removal procedures are consistent with due process); ECF No. 72 at 25 (Respondents arguing Abrego Garcia "is subject to detention under 8 U.S.C. § 1231 *as a result of his final order of removal*") (emphasis added).

---

[16] Given the absence of a removal order, the Court easily rejects Respondents' argument that the Petition must be dismissed because Abrego Garcia is a member of the putative class in *D.V.D. v. DHS*, 778 F. Supp. 3d 355 (D. Mass. 2025). ECF No. 72 at 15. The *D.V.D.* class is defined as noncitizens "subject to final orders of removal, allegedly at imminent risk of deportation to countries other than those authorized by their respective orders." *D.V.D. v. DHS*, 778 F. Supp. 3d 355, 368 (D. Mass.), *opinion clarified*, No. CV 25-10676-BEM, 2025 WL 1323697 (D. Mass. May 7, 2025), *and opinion clarified*, No. CV 25-10676-BEM, 2025 WL 1453640 (D. Mass. May 21, 2025), *reconsideration denied sub nom*. *D.V.D v. DHS*, 786 F. Supp. 3d 223 (D. Mass. 2025). Abrego Garcia, however, does not have a final order of removal and thus, falls outside the class. Moreover, even if Abrego Garcia could be considered part of the class, the Court disagrees this Petition must be dismissed as impermissible claim splitting because membership in an opt-out class remains a recognized exception to the claim-splitting rule. *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 432 (4th Cir. 2003) (quoting 18 MOORE'S FEDERAL PRACTICE § 131.40[3][e][iii] (2002)) (citing Restatement (Second) of Judgments § 26(1)(c) (1982)).

Section 1231, however, only permits such third-country removal proceedings upon the issuance of a final order of removal. Entitled "Detention and removal of [noncitizens] ordered removed," 8 U.S.C. § 1231 authorizes detention after the noncitizen "is ordered removed" and enters the "removal period." § 1231(a)(1)(A). Section 1231(a)(2)(A) further articulates the terms of release or detention during the removal period, and § 1231(b)(1)–(2) discusses the selection of alternate countries in the event the noncitizen is granted relief from removal, or where the designated country of removal is unwilling to accept him. *See also Guzman Chavez*, 594 U.S. at 542–43. Thus, without a final order of removal, § 1231 provides no lawful basis to detain and remove the noncitizen.

Respondents do not disagree. *Abrego I*, ECF No. 217 at 63:11–16 (Ernesto Molina, counsel for Respondents, explaining that ICE has statutory authority under 8 U.S.C. § 1231 to take into custody noncitizens subject to a final order of removal); *Abrego I*, ECF No. 235 at 86:6–17 (Sarmad Khojasteh, counsel for Respondents in *Abrego I*, explaining that the authority to remove Abrego Garcia flows from the final order of removal). Nor have they articulated any other basis to hold Abrego Garcia apart from § 1231. Accordingly, because Respondents continue to detain Abrego Garcia solely for the purpose of effectuating third-country removal under § 1231 but lack any authority to effectuate such removal absent a removal order, his continued detention must end.

### D. Release is Further Compelled Under *Zadvydas v. Davis*

Alternatively, continued detention appears constitutionally infirm under *Zadvydas v. Davis*, 533 U.S. 678 (2001). Although *Zadvydas* is an imperfect fit precisely because Respondents have no lawful authority to hold Abrego Garcia under 8 U.S.C. § 1231, its teachings are nonetheless instructive. There, the Supreme Court was called upon to set the due process limits of prolonged detention under § 1231. Or more particularly, "whether this post-removal-period

statute authorizes the Attorney General to detain a removable [noncitizen] *indefinitely* beyond the removal period or only for a period reasonably necessary to secure the [noncitizen's] removal" to a third country. *Zadvydas*, 533 U.S. at 682 (emphasis in original).

The *Zadvydas* Court concluded that to read § 1231 as permitting "indefinite detention" would "raise serious constitutional concern," that must be avoided by also reading an implicit reasonable time limitation on such detention. 533 U.S. at 682. Thus, the *Zadvydas* Court announced a presumptive six-month period of post-removal detention as sufficient to accord Respondents time to secure a suitable third country without running afoul of the noncitizen's Fifth Amendment due process rights. *Id.* at 701.

In so holding, the *Zadvydas* Court grounded its decision in three fundamental principles of special relevance to Abrego Garcia. First, as the Court explained, Respondents can only detain a noncitizen pursuant to the statutory authority of the INA, and with a purpose to effectuate lawful removal. *Zadvydas*, 533 U.S. at 683, 688–89. Although this principle may seem self-evident, it bears emphasizing for Abrego Garcia, as he has been held without a removal order, and thus without lawful authority.

Second, detention to effectuate third-country removal can only be for the period "reasonably necessary" to secure such removal. *Zadvydas*, 533 U.S. at 689. The presumptive six-month period announced in *Zadvydas* provides an important limitation on § 1231 to avoid indefinite detention. But it is a presumption which can be rebutted where the petitioner demonstrates that removal is not reasonably foreseeable. *See, e.g.*, *Cruz Medina v. Noem*, 794 F. Supp. 3d 365, 379 (D. Md. 2025). As *Zadvydas* emphasized, a noncitizen may be held only until "it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." 533 U.S. at 701. *See Jennings*, 583 U.S. at 299 ("[I]f the [noncitizen]

'provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future,' the Government must either rebut that showing or release the [noncitizen].") (quoting *Zadvydas*, 533 U.S. at 701).

Third, the *Zadvydas* Court reaffirmed that ICE detention exists for the "basic purpose" of securing third-country removal. *Zadvydas*, 533 U.S. at 699. *See also id.* at 697 (§ 1231 has "as its basic purpose effectuating [a noncitizen's] removal."); *cf. Demore v. Kim*, 538 U.S. 510, 527 (2003) (where removal was "no longer practically attainable," "detention there did not serve its purported immigration purpose") (quoting *Zadvydas*, 533 U.S. at 690); *Clark v Martinez*, 543 U.S. 371, 384 (2005) (§ 1231 "should be read . . . to authorize detention only for a period consistent with the purpose of effectuating removal."). Respondents are not to hold the noncitizen based on whim, caprice, or like motive. *Zadvydas*, 533 U.S. at 718 ("As persons within our jurisdiction, [noncitizens] are entitled to the protection of the Due Process Clause" which "includes protection against unlawful or arbitrary personal restraint or detention.") and at 721 ("[B]oth removable and inadmissible [noncitizens] are entitled to be free from detention that is arbitrary or capricious.") (Kennedy, J., dissenting). Nor can detention be used as punishment. "The proceedings at issue here are civil, not criminal," and so must be "nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690.

With these principles of *Zadvydas* as guidance, the Court turns to Abrego Garcia's continued detention. First, because Respondents have no statutory authority to remove Abrego Garcia to a third country absent a removal order, his removal cannot be considered reasonably foreseeable, imminent, or consistent with due process. Although Respondents may eventually get it right, they have not as of today. Thus, Abrego Garcia's detention for the stated purpose of third-country removal cannot continue.

Second, and equally troubling, the circumstances of Abrego Garcia's detention since he was released from criminal custody cannot be squared with the "basic purpose" of holding him to effectuate removal. *Zadvydas*, 533 U.S. at 697. That is, even if Abrego Garcia could have been lawfully removed to a third country, Respondents do not appear to have held him to fulfill that purpose. For if they had wished to remove him, they certainly could have as early as August 21, 2025, to Costa Rica. And even if the Court accords Respondents a measure of deference in exercising their discretion to favor another country, "discretion" cannot explain what happened next. *Cf. Zadvydas*, 533 U.S. at 696 (recognizing propriety of "habeas court's efforts to determine the likelihood of repatriation, if handled with appropriate sensitivity . . . .").

Respondents serially "notified" Abrego Garcia—while he sat in ICE custody—of his expulsion to Uganda, then Eswatini, then Ghana; but *none* of these countries were ever viable options, and at least two had not even been *asked* to take Abrego Garcia before Respondents claimed supposed removal to each. *See* ECF No. 52 at 28:10–13 (Schultz confirming the "United States has not had a discussion with Eswatini regarding Abrego Garcia"). *See also* ECF No. 52 at 32:18–19 (Schultz stating the notice of removal identifying Ghana was "prematurely sent" to Abrego Garcia).

At the same time, Respondents did not take any steps to remove Abrego Garcia to the country which *had* offered to take him, Costa Rica. This inexplicable reluctance seemed at odds with continued detention for purposes of third-country removal. So the Court asked repeatedly during oral arguments to address the disconnect. ECF No. 48 at 37:24–38:17; ECF No. 52 at 205:11–207:13; ECF No. 107 at 124:1–125:12; and twice compelled testimony to that effect, ECF Nos. 47 & 90. These orders were ignored without justification.

Respondents instead found a fourth African country, Liberia. This time, when the Court sought information about Liberia and Costa Rica so to fairly assess the validity of Abrego Garcia's claims, Respondents did not just stonewall. They affirmatively misled the tribunal. They announced that Liberia is the only viable removal option because Costa Rica "does not wish to receive him," ECF No. 85 at 9, and that Costa Rica will no longer "accept the transfer" of him, ECF No. 75-6 ¶ 5; ECF No. 85 at 14.

But Costa Rica had *never* wavered in its commitment to receive Abrego Garcia, just as Abrego Garcia never wavered in his commitment to resettle there. *See* ECF No. 108 at 1; Maria Sacchetti, *Costa Rica says it would accept Kilmar Abrego García, contradicting U.S.*, WASH. POST (Nov. 21, 2025), https://www.washingtonpost.com/immigration/2025/11/21/kilmar-trumpdeport-costarica/. *See also* Laura Romero, *Costa Rican official says country willing to accept Abrego Garcia, contradicting Trump administration officials*, ABC NEWS (Nov. 21, 2025), https://abcnews.go.com/International/costa-rican-official-country-accept-abrego-garcia-contradicting/story?id=127775855. This evidently remained an inconvenient truth for Respondents. But more to the point, Respondents' persistent refusal to acknowledge Costa Rica as a viable removal option, their threats to send Abrego Garcia to African countries that never agreed to take him, and their misrepresentation to the Court that Liberia is now the only country available to Abrego Garcia, all reflect that whatever purpose was behind his detention, it was not for the "basic purpose" of timely third-country removal. *Zadvydas*, 533 U.S. at 697.

**E. Abrego Garcia's Due Process Challenge to Removal Procedures**

Abrego Garcia separately challenges the lack of due process associated with Respondents' efforts to remove him to Liberia. ECF No. 71. He particularly presses that the Respondents' summary third-country removal policy articulated in the DHS Memorandum dated March 30,

2025, does not provide meaningful review of his fear-based claims of persecution, torture or refoulment. *Id.* at 18 (citing *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025)) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)) ("It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in the context of removal proceedings.") (internal quotation marks omitted). Given Liberia's nebulous offer of "temporary" status, and Respondents' history of erroneous removal to El Salvador, this challenge may very well have merit. *See Cruz Medina*, No. ABA-25-CV-1768, 2025 WL 2841488, at *10 (D. Md. Oct. 7, 2025) (granting injunctive relief directing respondents to accord petitioner meaningful judicial review of fear based claims concerning intended third-country removal); *Sagastizado v. Noem*, No. 5:25-CV-00104, 2025 WL 2957002, at *16 (S.D. Tex. Oct. 2, 2025) (same); *Nguyen*, 2025 WL 2419288, at *28–29 (granting immediate release and enjoining removal absent meaningful opportunity to be heard in reopened removal proceedings). The Court, however, need not reach the claim because the absence of a removal order precludes Respondents from removing Abrego Garcia at this juncture.

## V. Conclusion

As before, Abrego Garcia's case demands judicial intervention to ensure that Respondents choose constitutionally permissible means of implementing the INA. *Zadvydas*, 533 U.S. at 695. Because Abrego Garcia has been held in ICE detention to effectuate third-country removal absent a lawful removal order, his requested relief is proper. Separately, Respondents' conduct over the past months belie that his detention has been for the basic purpose of effectuating removal, lending further support that Abrego Garcia should be held no longer.

The Court orders Respondents to release Abrego Garcia from ICE custody immediately. Thereafter, he will receive instruction from the United States Pretrial Services Office as to installation on the release conditions previously imposed in his criminal case.[17]

A separate order follows.

December 11, 2025
Date

/s/
PAULA XINIS
United States District Judge

[17] Pursuant to the Bail Reform Act, 18 U.S.C. § 3142(c)(1)(B), the criminal court has imposed on Abrego Garcia the restrictive conditions of home detention with electronic monitoring, third-party custodianship, a residence requirement, and other programming to reasonably assure Abrego Garcia's appearance in court and the safety of the community. *See Tennessee Criminal Matter*, ECF No. 112.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

KILMAR ARMANDO ABREGO GARCIA, *

*Petitioner*, *

v. *

KRISTI NOEM, *et al.*, *

*Respondents*. *

Civil Action No. 8:25-cv-02780-PX

***

**ORDER**

For the reasons stated in the foregoing Memorandum Opinion, it is this 11th day of December, 2025, by the United States District Court for the District of Maryland, **ORDERED** that:

1. Petitioner Kilmar Armando Abrego Garcia's Petition for habeas corpus pursuant to 28 U.S.C. § 2241 at ECF No. 1 is hereby **GRANTED**;
2. Respondents **SHALL** release Abrego Garcia from ICE custody **immediately**;
3. Respondents **SHALL** notify Abrego Garcia's counsel of the exact time and location of his release no fewer than four hours prior to releasing him, and notify the Court of the status of Abrego Garcia's release by email to chambers no later than **5:00 p.m. today, Thursday, December 11, 2025**;
4. A representative of the United States Pretrial Services Office for this District **SHALL** separately contact Abrego Garcia's criminal counsel with further instruction for installation on the release conditions previously imposed in his criminal case, *United States v. Abrego Garcia*, No. 3:25-CR-00115-1 (M.D. Tenn.);
5. Respondents **SHALL** immediately transmit this Order and the accompanying

Memorandum Opinion to all relevant officers, agents, and employees under their control and who are involved in this matter and the pending criminal case, *United States v. Abrego Garcia*, No. 3:25-CR-00115-1 (M.D. Tenn.);

6. Within a week of the date of this Order, by **5:00 p.m. on Thursday, December 18, 2025**, the parties **SHALL** submit a joint status report as to the parties' position regarding resolution of Respondents' pending motion to dissolve at ECF No. 72; and
7. The Clerk is **DIRECTED** to transmit a copy of this Order to all counsel of record.

December 11, 2025
Date

/s/
Paula Xinis
United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| Kilmar Armando Abrego Garcia,<br>*Petitioner*,<br>v.<br>Kristi Noem, *et al.*,<br>*Respondents*. | Civ. No. 8:25-02780-PX |

**MEMORANDUM ORDER**

On December 11, 2025, this Court granted Kilmar Armando Abrego Garcia's Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2241 and ordered his immediate release from the custody of the Department of Homeland Security Immigration and Customs Enforcement ("ICE"), on the conditions imposed in the *United States v. Abrego Garcia,* 3:25-cr-00115-1 (M.D. Tenn.) ("*Tennessee Criminal Matter*"). ECF Nos. 110 & 111. The Court principally concluded that because Respondents had never issued Abrego Garcia a final order of removal, they could not lawfully detain him to effectuate removal at all. ECF No. 110 at 19–25. Alternatively, the Court concluded that if Abrego Garcia had been held pursuant to 8 U.S.C. § 1231 to effectuate third-country removal, his continued detention was constitutionally infirm under *Zadvydas v. Davis*, 533 U.S. 678 (2001). ECF No. 110 at 25–31. Thus, the Court ordered his immediate release. ECF No. 111.

Although Respondents released Abrego Garcia pursuant to this Court's Order, they also appeared to make speedy plans to re-detain him, in violation of certainly the spirit, if not the letter, of that decision. *E.g.*, ECF Nos. 112 & 112-1. Consequently, on December 12, 2025, Abrego

Garcia filed an emergency motion for a Temporary Restraining Order ("TRO") to prevent Respondents from immediately re-detaining him. ECF No. 112. The Court granted that motion pending supplemental briefing and further consideration. ECF No. 114.

The matter at ECF No. 112 is now ripe for resolution. For the reasons stated below, the Court grants Abrego Garcia's request to convert the TRO to one for injunctive relief and clarifies that the Court's habeas relief includes enjoining his re-detention under *Zadvydas* and its progeny, as previously articulated. *See* ECF Nos. 110 & 111.

The Court fully incorporates its decision granting habeas relief at ECF Nos. 110 & 111 and will summarize only relevant developments since that time. Within hours after the Court granted Abrego Garcia's habeas petition, Immigration Judge Phillip Taylor issued an order nunc pro tunc to correct a "scrivener's error;" namely, the omission of an order of removal to El Salvador within the October 10, 2019, order granting Abrego Garcia's withholding of removal ("withholding order"). ECF No. 112-2 at 5 (the "nunc pro tunc order"). The nunc pro tunc order specifically,

> Amend[ed] the [October 10, 2019] written decision in this case by *adding the following language*: The Respondent is ordered removed to El Salvador based on the charge contained in the Notice to Appear, but the Respondent's application for withholding of removal to El Salvador pursuant to INA § 241(b)(3) is granted.

ECF No. 112-2 at 5 (emphasis added).

Neither party appealed the issuance of the nunc pro tunc order, and it became final on January 12, 2026. The parties now agree that as of October 10, 2019, Abrego Garcia has been subject to an order of removal to El Salvador for which he received withholding protection. ECF No. 137 at 3; ECF No. 139 at 8. Similarly, the parties agree that Respondents' power to detain Abrego Garcia can only be to effectuate lawful removal to a third country pursuant to 8 U.S.C. § 1231. ECF Nos. 137 & 139.[1]

[1] Respondents had previously argued that until the nunc pro tunc order was final, Abrego Garcia was subject to

Section 1231(a)(1)(A) provides that "when a [noncitizen][2] is ordered removed, the Attorney General *shall remove* the [noncitizen] from the United States within a period of 90 days (in this section referred to as the 'removal period')." *Id.* (emphasis added). Section 1231(a)(1)(B)(i), in turn, defines the "removal period" as beginning on, among others not relevant here, "the date the order of removal becomes administratively final." During that 90-day removal period, the non-citizen "shall be detained." 8 U.S.C. § 1231(a)(2)(A). And as previously articulated in this Court's December 11, 2025, decision, if the noncitizen is not removed during the removal period or the three months thereafter (collectively the six-month presumptive period articulated in *Zadvydas*), his continued detention may violate due process, and his release may be constitutionally compelled. ECF No. 110 at 25–28.

Now, however, Respondents argue that because the nunc pro tunc order did not become final until January of this year, neither did the *underlying* 2019 order of removal. ECF No. 137 at 1, 6. Thus, say Respondents, because the order of removal did not become "administratively final" until last month, Abrego Garcia is still within the statutory "removal period," and his immediate re-detention and the resetting of the *Zadvydas* period are required. ECF No. 137 at 5–6.

Abrego Garcia responds that the nunc pro tunc order merely corrected that which should have been recorded in 2019, and that the correction of the self-styled "scrivener error" did not render the order of removal nonfinal. ECF No. 139 at 6. Rather, the order of removal, like the withholding order, became final in November 2019, when the time to appeal that order had passed. ECF No. 139 at 6–7 (citing 8 U.S.C. § 1101(a)(47)(B) and 8 C.F.R. § 1241.1(c)).

---

detention under 8 U.S.C. §§ 1225 or 1226. *See* ECF Nos. 129 & 129-1. They no longer take this position. ECF No. 137 at 3–6.

[2] This opinion uses the term "noncitizen" as equivalent to the statutory term "alien," in keeping with recent preferred nomenclature. *Avilez v. Garland*, 69 F.4th 525, 527 n.1 (9th Cir. 2023) (collecting cases). *See Barton v. Barr*, 590 U.S. 222, 254 n.2 (2020) (Kavanaugh, J., concurring) ("This opinion uses the term 'noncitizen' as equivalent to the statutory term 'alien.'") (citing 8 U.S.C. § 1101(a)(3). *See, e.g., United States v. Palomar-Santiago*, 593 U.S. 321 (2021); *Patel v. Garland*, 596 U.S. 328 (2022).

Abrego Garcia has the better argument. To understand why requires a brief explanation of what is—and is not—a "nunc pro tunc" order.

Nunc pro tunc means "now for then." *Roman Catholic Archdiocese of San Juan, P.R. v. Feliciano, et al.*, 589 U.S. 57, 65 (2020) (citation omitted). A nunc pro tunc order, therefore, represents a narrow, equitable remedy, rarely invoked to make historic court records "reflect what the . . . court actually intended to do at an earlier date;" that is, to make "the record[] speak the truth." *Carino v. Garland*, 997 F.3d 1053, 1058 (9th Cir. 2021) (citations omitted). Accordingly, a legitimate nunc pro tunc order must be given the "same legal force and effect *as if done at [sic] time when it ought to have been done*." *Id.* (quoting *United States v. Allen*, 153 F.3d 1037, 1044 (9th Cir. 1998)) (emphasis added). *See also* Nunc Pro Tunc, Black's Law Dictionary (5th ed. 1979); *In re Patel*, 142 F.4th 1313, 1322 (11th Cir. 2025) (nunc pro tunc order has "retroactive legal effect" with the "same legal force and effect as if made at the time when it should have been made") (citation omitted); *Patterson v. Chrysler Grp. LLC,* 845 F.3d 756, 761 (6th Cir. 2017) (nunc pro tunc orders "merely make the [court's records] speak the truth) (citation omitted); *Matthies v. R.R. Ret. Bd.*, 341 F.2d 243, 247 (8th Cir. 1965) ("But the function of an order nunc pro tunc is not to make an order now for then but to enter now for then an order previously made.") (citation omitted). Whatever the corrective action is, it must be entered "as of a time when it should or might have been entered up." *Mitchell v. Overman*, 103 U.S. 62, 64–65 (1880); *see also Gagnon v. United States*, 193 U.S. 451, 456 (1904) ("The power to amend its records, to correct mistakes of the clerk or other officer of the court, inadvertencies of counsel, or to supply defects or omissions in the record, even after the lapse of the term, is inherent in the courts of justice").[3]

[3] The propriety of using the doctrine of nunc pro tunc to insert a substantive order of removal may be up for debate. *See Glynne v. Wilmed Healthcare,* 699 F.3d 380, 384 (4th Cir. 2012) ("but where the court has omitted to make an order which it could have made, and in fact intended to make, it cannot subsequently make the same nunc pro tunc, so as to make it binding upon the parties to the suit from the date when it was so intended to have been entered.")

By contrast, a nunc pro tunc order, is *not* one which "rewrite[s] [the] history" of a case. *W.N.J. v. Yocom*, 257 F.3d 1171, 1172 (10th Cir. 2001) (citation omitted); *see also Cent. Laborers' Pension, Welfare and Annuity Fund v. Griffee*, 198 F.3d 642, 644 (7th Cir. 1999) (same). Nor is it one that alters the substantive rights of the litigants. *Mitchell,* 103 U.S. at 65 (nunc pro tunc orders are "founded in right and good sense, and to afford a safe and certain guide for the administration of justice,—it is the duty of the court to see that the parties shall not suffer by the delay."). A nunc pro tunc order, for example, cannot effectively reset the statutes of limitations, *see Patterson,* 845 F.3d at 762, or restart the time to bring an appeal. *See Crangle v. Kelly*, 838 F.3d 673, 680 (6th Cir. 2016) (where a putative "nunc pro tunc" order changed the substance of petitioner's sentence, the court construed the order as "a new judgment that reset the one year statute of limitations" to file a habeas corpus petition under 28 U.S.C. § 2244(d)(2)); *see also Herzog Contracting Corp. v. McGowen,* 976 F.2d 1062, 1065 (7th Cir. 1992) ("a party ought not be able to postpone the deadline for taking an appeal by filing a motion that doesn't actually ask for a change in the judgment."). To construe the effect of the nunc pro tunc order otherwise would permit the Court or litigants to create loopholes in the finality of judgments simply by recasting it via a new order issued nunc pro tunc*.* *Patterson*, 845 F.3d at 761 (rejecting construction of nunc pro tunc order that resets limitations because "in such a world, no claim would ever be truly time barred."); *see also Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 748 (11th Cir. 2014) (rejecting nunc pro tunc order that adds parties to an action as "work[ing] an injustice on the parties" not earlier named).

---

(quoting *ex parte Buskirk*, 72 F. 14, 20–21 (4th Cir. 1896)); *see also Transamerica Ins. Co. v. South*, 975 F.2d 321, 325 (7th Cir. 1992) (nunc pro tunc power "is no warrant for the entry of an order to record that which was omitted to be done.") (quoting *W.F. Sebel Co. v. Hessee*, 214 F.2d 459, 462 (10th Cir.1954)). The parties did not appeal the nunc pro tunc order. Accordingly, the Court accepts the validity of the nunc pro tunc order as adding an order of removal to the withholding order, effective October 10, 2019. *See* ECF No. 112-1; ECF No. 137 at 2; ECF No. 139 at 8. *See also* 8 U.S.C. § 1252(a)(5) & (b)(9).

Applying these basic principles here, the nunc pro tunc order is one that, by its own terms, "correct[ed] a scrivener's error" of having omitted the preceding order of removal that was necessary for the October 10, 2019, withholding order to be legally effective. ECF No. 112-2 at 5 ("but the order of removal to El Salvador, *which should have preceded the order granting him withholding of removal to El Salvador*, was erroneously admitted.") (emphasis added). Thus, the nunc pro tunc order did no more than add an order of removal effective October 10, 2019, which became administratively final thirty days later. *Cf. Gray v. Brignardello*, 68 U.S. 627, 627 (1863) ("[A] decree which was not actually meant to be made in a final form, cannot be entered in that shape nunc pro tunc in order to give validity to an act done by a judicial officer under a supposition that the decree was final instead of interlocutory.").

This is the only reading consistent with a true nunc pro tunc order. To read the order otherwise, as Respondents suggest, would indeed rewrite the history of this case. It would restart Respondents "removal period" pursuant to § 1231, and by extension, eviscerate the removal period and the six years when Respondents did nothing to effectuate third-country removal. *See* ECF No. 110 at 7–14. Respondents reading would also conveniently erase this last year of Abrego Garcia's detention and count none of it as relevant to the *Zadvydas* analysis. Because a "now for then" order cannot alter substantive rights or rewrite history, the Court must reject Respondents' arguments.

Instead, the nunc pro tunc order simply made the historic record "speak the truth" that the withholding order also included an order of removal to El Salvador but was apparently inadvertently left out from the withholding order. *Crosby v. Mills*, 413 F.2d 1273, 1277 (10th Cir. 1969). *See also Glynne*, 699 F.3d at 384 (collecting cases). Thus, this Court—and Respondents—must accept that truth, and the obvious legal consequences that flow from it. Because the nunc

pro tunc order itself is now final, then the underlying order of removal, effective as of October 10, 2019, became administratively final in November 2019. By extension, the "removal period" for which Abrego Garcia's detention had been compelled, was over long ago.

As to what this means for Abrego Garcia's continued release, it secures rather than undermines it. The Court had previously articulated the many reasons why the teachings of *Zadvydas* demanded release. ECF No. 110 at 25–30. Those reasons, and the factual underpinnings for them, squarely apply now that Abrego Garcia has a final order of removal *and* withholding of removal to El Salvador as of November 2019.

The Court incorporates the reasons articulated at ECF No. 110, and for clarity, summarizes them. First, since late 2019, Respondents made no effort to remove Abrego Garcia to a third country. They have also held him in some form of detention since March 2025 until this Court ordered his release, which even excepting the time spent in federal criminal custody, amounts to the presumptive six months of detention accorded to Respondents under *Zadvydas.* Add to this, the years of Respondents' inaction in effectuating third-country removal cuts decidedly against any requested finding that Abrego Garcia's removal is reasonably foreseeable. *See, e.g.*, *Zavvar v. Scott*, Civ. No. TDC-25-2104, 2025 WL 2592543 (D. Md. Sept. 8, 2025) (17 years of no efforts, or at best, minimal, unsuccessful efforts to effectuate third-country removal combined with no imminent prospect of removal warranted release under *Zadvydas*); *Villanueva v. Tate*, 801 F. Supp. 3d 689, 703 (S.D. Tex. 2025) (granting petition for release under *Zadvydas* where "during the 8-year period since Villanueva was ordered removed," and while petitioner was on release, "the government's efforts to remove him—sparse and sporadic as they may have been—have been unsuccessful.").

Second, even if the Court does not count Abrego Garcia's months in which Respondents procured his detention in a Salvadoran prison as time strictly spent in ICE custody, Abrego Garcia has nonetheless demonstrated that "no significant likelihood of removal" exists "in the reasonably foreseeable future," thus compelling release. *Zadvydas*, 533 U.S. at 701. Regardless of the actual jailer, Respondents had purchased Abrego Garcia's detention in El Salvador and disingenuously slow footed his return. *See generally*, *Abrego Garcia v. Noem et al.*, 8:25-cv-00951-PX (D. Md. 2025). *See also* ECF No. 110 at 4–5. And since August 2025, Respondents have refused to procure Abrego Garcia's immediate removal to Costa Rica in favor of phantom removals to three (maybe four) African countries. Indeed, since Abrego Garcia secured his release from criminal custody in August 2025, Respondents have made one empty threat after another to remove him to countries in Africa with no real chance of success. ECF No. 110 at 7–14. At the same time, Respondents purposely—and for no reason—ignored the one country that has consistently offered to accept Abrego Garcia as a refugee, and to which he agrees to go. *Id.* *See also* ECF No. 52 at 102:8–12, 105:12–15 (Respondents' witness acknowledging the absence of any evidence that "Abrego Garcia going to Costa Rica would be prejudicial to the interests of the United States").[4]

Although Respondents still claim that Liberia would accept Abrego Garcia, more recently they have asserted that they are pursuing removal to "various countries" apart from Liberia, thus undermining the reliability of Liberia itself as a legitimate option. ECF No. 137 at 10. And as of January 14, 2026, Respondents had not yet secured any travel documents necessary to effectuate Abrego Garcia's third-country removal, despite their claims to be "working to get travel

[4] In scores of cases that this Court has reviewed involving similar *Zadvydas* challenges, none involve a petitioner who has agreed to deport to a third country willing to take him, yet who remains in Respondents' custody under the pretense of effectuating prompt third-country removal. Continued detention on these extraordinary facts would violate due process in any event. *See Gurung v. Warden, S. Texas Ice Processing Ctr.*, No. SA-25-CA-01614-XR, 2026 WL 93145, at *6 (W.D. Tex. Jan. 6, 2026) ("A detained person who brings a *Zadvydas* claim *before* the presumptively reasonable six-month period must *prove* that 'there is no significant likelihood of removal in the reasonably foreseeable future.'") (quoting *Zadvyda*s, 533 U.S. at 699–700) (emphasis in original).

documents." ECF No. 138 at 11:12–16. *Cf. Chennah v. Baltazar*, Civ. No. 1:26-cv-00112-CNS, 2026 WL 179951, at *3–4 (D. Colo. Jan. 23, 2026) (where no travel documents or any other evidence to suggest that Respondents' removal efforts are other than "haphazard" and no evidence of imminent removal to an identified third country, release under *Zadvydas* is warranted); *Banoub v. Crawford*, No. 3:25CV917, 2025 WL 3723458, at *11–12 (E.D Va. Dec. 23, 2025) (Respondents' requests to third countries without having secured travel documents or set a date of departure does not "remotely demonstrate" removal is likely in foreseeable future); *Gomez-Simeon v. Bondi*, No. SA-25-CV-01460-JKP, 2025 WL 3470872, at *2 (W.D. Tex. Nov. 24, 2025) (mere conclusory statements regarding "efforts to remove the petitioner to a third-party country including Mexico" insufficient to justify continued detention "with no removal plan"); *Douglas v. Baker*, Civ. No. ABA-25-2243, 2025 WL 2997585, at *3 (D. Md. Oct. 24, 2025) (failure to produce evidence of any efforts taken to remove petitioner to intended third country warranted release under *Zadvydas*); *Abuelhawa v. Noem*, No. 4:25-CV-04128, 2025 WL 2937692, at *9 (S.D. Tex. Oct. 16, 2025) (conclusory statements of intended removal to a third country are insufficient to demonstrate significant likelihood of removal) (collecting cases).

From this, the Court easily concludes that there is no "good reason to believe" removal is likely in the reasonably foreseeable future. *Castaneda v. Perry*, 95 F.4th 750, 756 (4th Cir. 2024) (quoting *Zadvydas*, 533 U.S. at 701). Respondents have done nothing to show that Abrego Garcia's continued detention in ICE custody is consistent with due process. Thus, he must remain on the stringent release conditions already imposed by ICE and in the *Tennessee Criminal Matter*.

Based on the foregoing and related reasons articulated in the decision granting habeas relief at ECF No. 110 at 25–31, it is this 17th day of February, 2026, hereby ORDERED that:

Respondents are ENJOINED from taking Petitioner Kilmar Armando Abrego Garcia into

ICE custody. This injunction is made part of the Order at ECF No. 111.

Respondents SHALL immediately transmit this Order to all relevant officers, agents, and employees under their control and who are involved in this matter and in the *Tennessee Criminal Matter*.

Date: February 17, 2026

/s/
PAULA XINIS
United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

| | |
|---|---|
| KILMAR ARMANDO ABREGO GARCIA,<br><br>Petitioner,<br><br>v.<br><br>KRISTI NOEM, ET AL.,<br><br>Respondents. | Case No. 8:25-CV-02780-PX<br><br>**MOTION TO DISSOLVE INJUNCTION AGAINST PETITIONER'S DETENTION (ECF 141) AND INJUNCTION AGAINST PETITIONER'S REMOVAL (ECF 13)** |

## INTRODUCTION

This Court should dissolve the active injunctions at ECF 141 and ECF 13, as both rest on clear legal errors and neither is equitable when applied prospectively. Dissolution is warranted as a factual matter based on the declaration submitted as Exhibit A to this motion, which establishes that the United States government presently stands ready, willing, and able to remove Petitioner to Liberia, and the only impediment to Petitioner's removal is the Court's injunction barring Petitioner's removal. *See* ECF 13. Dissolution is also warranted because the Court's Memorandum Order failed to acknowledge that the Court's own prior injunction against removal is the sole impediment to Petitioner's prompt removal. The Court cannot both impose the impediment that delays removal and consequently prolongs detention and, at the same time, hold that the resulting detention is impermissibly prolonged.

That is particularly so when the Court invited the government to move to dissolve the injunction barring Petitioner's removal when it was ready to effectuate the removal. ECF 52, at 37. The government filed that motion less than a month later on November 7, 2025. ECF 72. But the Court has left that motion pending for months. The government accordingly requests that the Court dissolve its injunctions barring Petitioner's detention pending removal (ECF 141) and reiterates its request for the Court to dissolve the injunction barring Petitioner's removal (ECF 13)

to permit the government to effectuate Petitioner's lawful removal to Liberia. The government also requests a ruling on this Motion to Dissolve the injunctions by Friday, April 17, 2026. After that date, the government will consider the Court to have denied dissolution of both injunctions.

**BACKGROUND**

On June 6, 2025, Petitioner was paroled into the United States. ECF 1 at 10; *see also* ECF 6 (submitted under seal). On that date, he was taken into criminal custody to face criminal charges in the Middle District of Tennessee. *See U.S. v. Abrego Garcia,* No. 3:25-cr-115, ECF 9 & 10. On August 22, 2025, the Petitioner was released on bond relating to his criminal proceedings. *See U.S. v. Abrego Garcia*, No. 3:25-cr-115, ECF 112. On August 25, 2025, Petitioner was taken into custody by Immigration and Customs Enforcement ("ICE") in Baltimore, Maryland, pending removal. *See* ECF 1 at ¶ 43. That same day, the Petitioner filed a Motion to Reopen before the immigration judge, pursuing an opportunity to apply for asylum and withholding of removal based on his fear of removal to Uganda, as well as requesting other relief. ECF 28-1 at 2, 12.

Also on August 25, 2025, Petitioner filed a habeas petition challenging his detention based on *Zadvydas v. Davis*, as well as a number of other claims. *See generally* ECF 1. In a conference with the district court that day, the Government agreed that it would not remove Petitioner while his Motion to Reopen was pending before the immigration judge. ECF 24 at 21. This Court entered a letter order on August 27, 2025, enjoining ICE, or members of the United States government, "from removing the Petitioner from the continental United States." ECF No. 20. That order contained no analysis regarding whether Petitioner had satisfied the requirements for an injunction, such as whether there was a likelihood of success and whether the equities favored issuing the injunction. *Id.*

On October 10, 2025, this Court held an evidentiary hearing. *See generally* ECF 52. During the hearing, this Court agreed that if the Government were in a position to effectuate removal, it could move the Court to dissolve the previous order enjoining removal. *See* ECF 52, at 37 ("[A]t any point you can ask me to modify, dissolve, end . . . the injunction."); *see also id.* at 2-52.

On October 24, 2025, the government filed notice with this Court that the government of Liberia has agreed to accept the Petitioner and has relayed diplomatic assurances regarding this treatment and status. ECF No. 56. Likewise, on October 24, 2025, the government notified Petitioner, through counsel, that he would be removed to Liberia if the government were permitted to do so. ECF 57-1 at 3. On October 24, 2025, Petitioner communicated a fear of removal to Liberia, prompting a screening by the United States Citizenship and Immigration Services ("USCIS"). *Id.* at 2. USCIS performed that screening on October 28, 2025. *See* ECF 72-7 (public) and 75-4 (sealed) (interview record). On October 28, 2025, USCIS concluded that Petitioner did not demonstrate that it was more likely than not that he would be persecuted or tortured in Liberia. *See* 72-8 (public) and 75-5 (sealed) (decision).

On November 7, 2025, the Government moved to dissolve the injunction. *See* ECF 72. Importantly, the government argued that Liberia was willing to accept Petitioner and that ICE was ready to effectuate his removal immediately upon the dissolution of the injunction. ECF 72 at 5-7; *see also* ECF 72-3 (public) and ECF 75-2 (sealed) (Determination by Kristi Noem); ECF 72-4 (public) and ECF 75-3 (sealed) (Letter from Secretary of State Marco Rubio to Secretary of Homeland Security Kristi Noem); ECF 72-5 (public) and 75-3 (Diplomatic Assurances received from the Government of Liberia); ECF 72-6 (Announcement by Liberian Ministry of Information). Regarding the likelihood of success, the motion had two major premises. First, that the Court

lacked jurisdiction or was barred from hearing several of Petitioner's claims. ECF 72 at 7-22. Further, the Government argued that his several claims lacked merit. ECF 22-32.

On December 11, 2025, the Court issued its Memorandum Opinion and Order. ECF 110 & 111. The Court rejected the government's jurisdictional arguments under 8 U.S.C. 1252(a)(5), (b)(9), and (g) based on its determination that Petitioner was not challenging the execution of a final order of removal; rather, the Court concluded that Petitioner's detention was unlawful "because he is held in the *absence* of such a removal order." ECF 110 at 16; *see id.* at 19-24. The Court then ruled that, in the absence of an order, Petitioner's further detention violated the Immigration and Nationality Act and due process. *Id.* at 24-29. The Court did not rule on the government's motion to dissolve at ECF 72. *See generally* ECF 111.

Following this Court's December 11, 2025 order granting Petitioner's Petition for Writ of Habeas Corpus, ECF No. 110, 111, Respondents promptly released the Petitioner under an "ICE Order of Supervision." *See* ECF 112-1, 112-2. On December 11, 2025, Immigration Judge Phillip Taylor issued an order of removal *nunc pro tunc* and designated El Salvador as the country of removal on December 11, 2025, making the order effective as of October 10, 2019. *Id*. 112-2. Following a hearing and requests for clarification, Respondents submitted a corrected ICE Order of Supervision with accurate authority to detain Petitioner pending removal on December 26, 2025. ECF No. 126-1 at 2. On January 5, 2026, Petitioner purported to waive his right to appeal the order. ECF No. 130 at 2. Petitioner did not file an appeal to the Board of Immigration Appeals within the 30-day deadline. *See* 8 C.F.R. § 1003.38(b).

Shortly after Petitioner's release on December 11, 2025, Petitioner filed an emergency motion for a temporary restraining order. ECF 112. In it, he urged that he had a likelihood of success because (1) the immigration judge lacked jurisdiction; (2) the purported order was not a

final order of removal; (3) the purported order of removal violated due process; and (4) the government could not detain him under *Zadvydas*. ECF 112 at 3-4.

On December 12, 2025, the Court granted an emergency temporary restraining order. ECF 114. The Court indicated that under *Zadvydas,* the newly issued order of removal was effective as if issued in 2019, then the removal period had long passed. ECF 114 at 2-3. Further, the Court indicated that the equities for a temporary restraining favored the Petitioner. ECF 114 at 3-4.

On February 17, 2026, the Court granted Petitioner's request to convert the "TRO" into injunctive relief. ECF 141 at 2. In granting injunctive relief, the Court fully incorporated its decision at ECF 110. ECF 141 at 2. The Court discussed the import of the *nunc pro tunc* order of removal to its prior decision finding that detention was in appropriate under *Zadvydas*. *Id.* at 3-7. It did not discuss the import of a now existing final order on its jurisdiction, nor did it discuss the import of the August injunction on the *Zadvydas* calculus, nor did it discuss the equities requisite for an injunction. *See generally* ECF 141.

On March 2, 2026, Todd Lyons, Senior Official Performing the duties of the Director of ICE, issued a decision disregarding Petitioner's designation of Costa Rica as the country of removal. *See* Exhibit B.

## STANDARD OF REVIEW

"Because injunctive relief is drafted in light of what the court believes will be the future course of events, a court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an instrument of wrong." *Salazar v. Buono*, 559 U.S. 700, 714-15 (2010) (plurality op.) (internal quotation marks, ellipsis, and citation omitted). Courts have sometimes analogized dissolution of a preliminary injunction to the general equitable principles set forth in Rule 60(b)(5), although the rule does not by its terms apply to a

motion to dissolve a preliminary injunction. *See Centennial Broad., LLC v. Burns*, 433 F. Supp. 2d 730, 733 (W.D. Va. 2006). Courts regularly dissolve preliminary injunctions when changed circumstances undermine the basis for the interlocutory relief. *See, e.g., Ctr. For Individual Freedom, Inc. v. Tennant*, 706 F. 3d 270, 276-79 (4th Cir. 2013) (discussing dissolution of injunction in response to amendment of challenged law). Ordinarily, "dissolution should depend on the same considerations that guide a judge in deciding whether to grant or deny a preliminary injunction in the first place"—*i.e.*, "[t]he familiar quartet" of "likelihood of success, the threat of irreparable injury to the party seeking interim relief, the equities and the public interest." *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, 1225 (1st Cir. 1994).

## ARGUMENT

### I. The Court Should Dissolve Its Order Barring Detention Because The Government Would Promptly Remove Petitioner Absent The Court's Order Barring Plaintiff's Removal, And The Court Failed To Consider The Jurisdictional Consequences Of The Now-Undisputed Existence Of A Final Order Of Removal

The Court's order barring detention of Petitioner, ECF 141, warrants dissolution for three reasons.

*First*, where, as here, the government could and would remove an alien but for his continued litigation, *Zadvydas* does not render continued detention unlawful. *See Prieto-Romero v. Clark*, 534 F. 3d 1053, 1062 (9th Cir. 2008). Petitioner "foreseeably remains capable of being removed" at present, "and so the government retains an interest in assuring his presence at removal." *See Prieto-Romero*, 534 F.3d at 1065; *Callender*, 281 F. Supp. 3d 428, 436 (S.D.N.Y. 2017) ( "there is substantial evidence that petitioner can and will be removed as soon as his pending immigration proceedings—all of them filed by petitioner himself—are resolved").

As the government has maintained, and as remains true as of the date of this filing, removal to Liberia can be completed in a matter of days as soon as the injunctions currently preventing

removal are dissolved. Exh. A, Declaration of John A. Schultz, Jr., ¶ 19. The Department of State has been in communication with Liberia, and Liberia maintains its willingness to accept the Petitioner with necessary human rights protections. *Id*. at ¶ 16. This removal agreement has not changed since October 2025 and remains the path of removal as soon as the injunctions are dissolved. The United States has consistently argued against Petitioner's claims that Costa Rica is the only country to which he can be removed. In fact, the government still maintains that removal to Costa Rica would be prejudicial to the United States. *See* Exh. B, Memorandum Disregarding Designation of Costa Rica. Thus, any attempt by this Court to permanently enjoin the government from exercising its authority to remove the Petitioner from this country is in direct contradiction to established judicial norms, and a clear error of law. The Court's contrary conclusion contradicts the evidentiary record, which amply establishes that the government has, for months and continuing to the present day, been ready, willing, and able to promptly remove Petitioner. This case presents none of the concerns of "potentially permanent" prospective detention present in *Zadvydas v. Davis*, 533 U.S. 678, 691 (2001).

*Second*, the Court should dissolve its order barring the government from detaining Petitioner pending his imminent removal because the order failed to recognize that the only barrier to Petitioner's immediate removal is the Court's own preliminary injunction barring his removal. Petitioner has been detained in U.S. Immigration and Customs Enforcement ("ICE") custody for less than a week. On March 12, 2025, ICE arrested and detained Petitioner for removal from the United States. ECF 110 at 4. On March 15, 2025, Petitioner was removed. *Id*. From March 15, 2025, through June 6, 2025, Petitioner was not in ICE custody. On June 6, 2025, Petitioner was paroled into the United States and detained under a criminal indictment in the Middle District of Tennessee. *Id*. at 5. Once again, Petitioner was not detained in ICE custody and was not under ICE

control. On August 22, 2025, Petitioner was released from criminal custody. ECF 28 at 4. On August 25, 2025, Petitioner was taken into ICE custody in order "to effectuate removal pursuant to the 2019 final removal order." *Id*. The very same day, on August 25, 2025, this Court entered an order prohibiting the removal of Petitioner, thus pausing the *Zadvydas* clock in calculating the reasonably removal period. *See* ECF 13. Thus, at most, Petitioner's time detained in ICE custody pending removal can be calculated at 6 days.

Petitioner's actions "to prevent [his] removal subject to an order of removal" extend the removal period by operation of 8 U.S.C. § 1231(a)(1)(C). ECF 137 at 10. "It is well settled ... that an alien cannot, through unilateral action, create the very circumstance that he relies on for relief under *Zadvydas*." *Id. at* 437; *see also, e.g., Ambimola v. Ridge*, 181 F. App'x 97, 99 (2d Cir. 2006) (rejecting *Zadvydas* claim in part because "the real reason for [petitioner's] lengthy detention" was his "seeking and/or receiving numerous judicial stays and filing his numerous petitions for reconsideration and appeals."); *Callender v. Shanahan*, 281 F. Supp. 3d at 435 ("[Petitioner] must establish that the bottleneck is not due to his own continuing efforts to litigate."). Instead, "[t]he six-month period is tolled … if the alien acts to prevent his removal." *Guo Xing Song v. U.S. Atty. Gen.*, 516 F. App'x 894, 899 (11th Cir. 2013). And the Fourth Circuit has further admonished that "*Zadvydas* should not be expanded beyond the context of the *indefinite and potentially permanent* detention involved there." *Castaneda v. Perry*, 95 F.4th 750, 757 (4th Cir. 2024) (citing *Miranda v. Garland*, 34 F.4th 338, 361 (4th Cir. 2022)) (emphasis added). Extending *Zadvydas* to instances where the alien has himself secured an injunction preventing his removal is just such an expansion that *Castaneda* prohibits.

This Court committed clear legal error by not recognizing the impact of its own preliminary injunction barring Plaintiff's removal, and further, not recognizing that Petitioner's detention has

not reached the 180-day threshold. If Petitioner is taken into detention today for purposes of effectuating his immediate removal, section 1231 provides clear authorization for his detention for a presumptively-reasonable 180 days thereafter. Of course, the government would not take nearly so long to remove Petitioner. As previously acknowledged by Petitioner, and shown in the attached exhibits, the government is prepared to effectuate Petitioner's removal in an extremely expeditious manner upon dissolution of the injunctions impeding removal. ECF 71 at 6-7. The Court's orders barring Petitioner's removal and barring any brief detention incident to removal are the only impediment to Petitioner's immediate removal. It is clearly erroneous, and a manifest injustice, to permit a petitioner to manufacture a legal obstacle to his removal and then hold that that legal obstacle suffices to prevent detention pending removal.

*Third*, the Court should dissolve its February 17, 2026 order because it failed to consider the consequences of the undisputed existence of a final order of removal for jurisdiction. In its order on December 11, 2025, the Court concluded that it had jurisdiction despite the limits on district court jurisdiction in 8 U.S.C. § 1252(a)(5), (b)(9), and (g) because it concluded there was no final order of removal. ECF 110 at 14. But when the Court considered the effect of the *nunc pro tunc* correction of the final order of removal, it merely adopted "the foregoing and related reasons articulated in" the December 11, 2025 order, without any re-evaluation of the jurisdictional bars in light of the undisputed existence of a final order of removal which obviated the Court's previous reasoning. ECF 141 at 2.

Prohibiting the government from detaining Petitioner to the minimal extent necessary to remove him also is detrimental to public interest. An immigration judge ("IJ") concluded that "the evidence show[ed] that [Plaintiff] is a verified member of MS-13" and that he "failed to present evidence to rebut that assertion." ECF 115 at 13; *see also* ECF 72-1 at 2-3. The IJ further concluded

that "as a member of a notorious and violent gang, [Petitioner] presented a danger to Americans." *Id*. The IJ's decision and conclusion were affirmed in 2019 by the BIA, and Petitioner has not appealed. *See* ECF 72-2. Similarly, throughout this litigation, Petitioner has continually admitted that he arrived unlawfully and conceded removability. Thus, the public interest favors dissolution of the injunction barring detention of Petitioner pending his removal.

## II. The Court Should Promptly Rule On The Government's Still-Pending Motion To Dissolve The Preliminary Injunction Barring Removal

The Court should also promptly rule on the government's motion to dissolve the preliminary injunction barring Petitioner's removal (ECF 81), which has been pending since November 13, 2025. For all the reasons in that motion, and additionally because the exhibits submitted with this motion establish a clear path to Petitioner's prompt removal and Petitioner now undisputedly has an administratively final order of removal, the Court should dissolve its preliminary injunction barring Petitioner's removal.

Maintaining the preliminary injunction (and for that matter, the Memorandum Order at ECF 141) is particularly improper because the preliminary injunction was not based on any analysis by the Court regarding Petitioner's likelihood of success or the non-merits injunction factors. At a hearing on August 25, 2025, the Government agreed that it would not remove Petitioner while his Motion to Reopen was pending before the immigration judge. ECF 24 at 21. Despite that assurance, the Court nevertheless entered a preliminary injunction by a letter order on August 27, 2025, enjoining the government "from removing the Petitioner from the continental United States." ECF No. 20. In doing so, the Court provided no analysis to justify the injunction, *id.*, even though that analysis is expressly required by binding precedent and governing rules. *See*

*Winter v. NRDC*, 555 U.S. 7 (2008); Fed. R. Civ. P. 65(d)(1) (requiring "[e]very order granting an injunction" to "state the reasons why it issued").

For the reasons previously explained, the injunction against removal plainly violates multiple provisions of the INA, including 8 U.S.C. § 1252(a)(5), (b)(9), and (g), and is not supported by the required analysis.

**CONCLUSION**

For the foregoing reasons, the Court should dissolve its injunctions against removal and detention of Petitioner. Respectfully, the government requests the Court enter a ruling on the Motion by Friday, April 17, 2026. After that date, the government will consider the motion to dissolve as having been denied.

Dated: March 20, 2026

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General
U.S. Department of Justice
Civil Division, Office of Immigration Litigation

JONATHAN GUYNN
Deputy Assistant Attorney General
U.S. Department of Justice
Civil Division, Torts Branch

/s/ Ernesto H. Molina, Jr
ERNESTO MOLINA, JR.
Deputy Director
Office of Immigration Litigation

SHANE A. YOUNG
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation

P.O. Box 878, Ben Franklin Station
Washington, DC 20044
202-451-7483
Shane.a.young@usdoj.gov

ATTORNEYS FOR RESPONDENTS

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2026, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Ernesto H. Molina, Jr.*
ERNESTO H. MOLINA, JR.
Deputy Director
United States Department of Justice
Civil Division
Office of Immigration Litigation

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

KILMAR ARMANDO ABREGO GARCIA, *

*Petitioner*, *

v. * Civil Action No. 8:25-cv-02780-PX

MARKWAYNE MULLIN, *et al.*, *

*Respondents*. *

***

**SCHEDULING ORDER**

For the reasons discussed during today's recorded scheduling conference, the Court sets the following deadlines below. The Court also addresses the Respondents' suggestion that it *must* decide their pending motion to dissolve the injunction that prohibits Abrego Garcia's removal from the continental United States ("motion to dissolve") by the date of their choosing—April 17, 2026—or else they will deem the motion "denied." ECF No. 142 at 2, 11. Respondents cannot dictate the Court's schedule or the outcome of the motion. Nor can they appeal a judicial order that does not exist.

Respondents also wrongly attempt to lay at the Court's feet the delay in reaching the pending motion to dissolve. A careful recapitulation of the record since the filing of the habeas Petition shows that, if anyone, Respondents bear the responsibility for substantial delay.

When Abrego Garcia filed the habeas Petition on **August 25, 2025**, the Court's Amended Standing Order barred Abrego Garcia's removal from the continental United States for two business days. ECF No. 5. Of course, Respondents had already told the Court that third-country removal was not "imminent" and that Respondents had "no timeline" for removal. *Abrego Garcia v. Noem*, 8:25-cv-00951-PX ("*Abrego I*"), ECF No. 214 at 4 (D. Md. 2025). Nonetheless, on

**August 26, 2025**, the Court held a status conference announcing it would resolve the habeas Petition "as fast as is just," and proposed holding a hearing within the week. ECF No. 14 at 4:12.

Respondents resisted quick disposition and reasserted that "removal is not imminent," that such "third country removals often take some time, and that that is not likely to occur in the sort of window where a TRO would otherwise be in place." ECF No. 14 at 8:4–7. So, Respondents asked for a schedule that "may not be as quick" because such a schedule "may not be necessary here." *Id*. at 8:10–11. Counsel further acknowledged that the Court would keep the injunction barring Abrego Garcia's removal in place until resolution of the habeas Petition. *Id.* at 8:17–9:6. The Court also made specific findings as to why the injunction barring removal was warranted at that juncture. *Id*. at 5:2–8:16.

The same day, the parties proposed separate briefing schedules, ECF Nos. 15 & 16, prompting the Court to convene a scheduling conference the next day on **August 27, 2025**, ECF No. 24. The parties asked the Court to delay resolution of the habeas Petition pending conclusion of the reopening of the immigration proceedings.[1] ECF No. 24 at 5:4–22. The Court agreed but emphasized the need to "get this [habeas] process under way," and set a hearing for **October 6, 2025**, consistent with the parties' request. *Id*. at 10:8, 12:8–13:3.

On **September 25, 2025**, however, Respondents asked to "continue the evidentiary hearing subject to the same proviso that Petitioner not be removed from the continental United States prior to the hearing" at a date "convenient for the Court." ECF No. 30 at 1. The Court thus converted the **October 6** hearing to a status conference with the Respondents' consent that the injunction remain in place. ECF No. 31.

---

[1] Abrego Garcia moved to reopen his immigration proceedings on Respondents' suggestion because, in their view, reopening those proceedings would be the "appropriate procedural mechanism" to raise several of his challenges. ECF No. 14 at 14:14–15:3. *See also* ECF No. 71 at 15.

At the hearing on **October 6, 2025**, the Court learned that Respondents had made no real progress to remove Abrego Garcia to any third country and yet continued to hold him in immigration custody. ECF No. 48 at 6:25–7:22. Accordingly, the Court was prepared to adjudicate whether Abrego Garcia should be released that day. *Id*. at 9:9–18. Respondents objected and asked for an evidentiary hearing even though they "ha[d]n't formalized a particular plan for removal yet." *Id*. at 12:22–24. The Court set the hearing for **October 10, 2025**. ECF No. 50.

At the **October 10** hearing, Respondents' counsel disingenuously suggested the only impediment to lawful removal of Abrego Garcia had been the Court's injunction. ECF No. 52 at 34:3–35:10. So the Court admonished counsel and reminded them if they wished to have the injunction lifted, they must file their motion to dissolve as previously discussed. *Id.* at 35:2–7, 38:21–22.

On **October 24, 2025**, Respondents identified Liberia as the fourth African country to which they sought to send Abrego Garcia, and despite months of delay, now asserted they wished to "effectuate removal as soon as October 31." ECF No. 56 at 2. Respondents anticipated that they would reject Abrego Garcia's claimed fear of removal to Liberia, at which point they would ask for the dissolution of the injunction. ECF No. 64 at 13:10–15. Respondents also acknowledged that the injunction would remain in place pending the resolution of any motion to dissolve. *Id.* at 13:20–14:19. The parties proposed a briefing schedule, to include the motion to dissolve, which the Court adopted and set a hearing for **November 20, 2025**. ECF Nos. 65 & 66.

Respondents next filed the motion to dissolve on **November 7, 2025**, which they now complain has been pending "for months." ECF No. 142 at 1. What happened next explains why.

Much of the **November 20, 2025**, hearing was devoted to the non-existence of a final order of removal for Abrego Garcia. *See* ECF No. 107. The absence of that order meant that Respondents—for six years—never had authority to remove Abrego Garcia to any third country. On this point, Respondents *agreed.* If "there is no final order of removal," conceded Respondents' counsel, Drew Ensign, "then the government would take the position it could not remove him." ECF No. 107 at 156:22–24. While Respondents now insinuate this Court has sat on its hands regarding the dissolution motion, the reality is that Respondents had no lawful authority to remove Abrego Garcia unless and until a final order of removal issued. *See* ECF No. 110 at 19–25. The injunction, in this respect remained an entirely appropriate prophylaxis because Respondents already had demonstrated the capacity to remove Abrego Garcia without lawful authority, *see Abrego I*, and the injunction visited no prejudice on Respondents.

On **December 11, 2025**, the Court issued its written decision confirming that because no final order of removal existed, Abrego Garcia must be released from immigration detention. ECF Nos. 110 & 111. Respondents never appealed that decision. That same day, **December 11**, an Immigration Judge sua sponte issued a nunc pro tunc order of removal effective October 2019. ECF No. 112-2. However, Respondents agreed that they still had no lawful authority to remove Abrego Garcia until the December 11 nunc pro tunc order became final, which at the earliest, would be thirty days later. ECF No. 115 at 1.

Nonetheless, Respondents tried to re-detain Abrego Garcia which this Court separately enjoined. ECF No. 114. The Court held a hearing on **December 22, 2025**, to ascertain whether it should continue to prohibit the rearrest of Abrego Garcia. ECF No. 122. The Court also tried to understand what new legal bases allowed Respondents to hold Abrego Garcia in immigration custody. ECF No. 123. The Court granted Respondents until **December 26, 2025**, to articulate

the basis for re-detention in the absence of a final order of removal. *Id.* Respondents thereafter sought a brief delay of their filing which the Court granted. ECF No. 127.

But by this point, the nunc pro tunc order of removal become final on **January 12, 2026**. ECF No. 130 at 1–2. So, on **January 14, 2026**, the Court held a status conference to discuss next steps. ECF No. 135. Now, the parties agreed that the motion to dissolve the injunction was finally ripe for resolution alongside Abrego Garcia's continued release pending such removal. ECF No. 138 at 5:2–23. But Respondents wanted further briefing. *Id.* at 5:20–8:25. Respondents also made clear that third-country removal was, once again, not imminent, because "the government [was] working to get travel documents but [did] not have those at the moment." *Id.* at 11:14–17. Thus, with Respondents' agreement that the status quo would remain, the Court granted their request for more briefing. *Id.* at 11:18–24; *see also* ECF No. 136.

On **February 2, 2026**, the matters were fully briefed and on **February 17, 2026**, the Court issued its final decision preventing the re-detention of Abrego Garcia pending removal, in part because Respondents have yet to produce travel documents to any country, nothing suggested that his removal was reasonably foreseeable, and Respondents had not shown Abrego Garcia's re-detention in ICE custody is consistent with due process. ECF No. 141 at 8–9.

Now, for the first time since this tortured history, Respondents insist that they are ready to remove Abrego Garcia to Liberia,[2] that is, according to the motion they filed on **March 20, 2026**. ECF No. 142. Respondents did not move to shorten the time for Abrego Garcia to respond to that motion, and so Abrego Garcia timely filed his opposition on **April 3, 2026**. ECF No. 144.

[2] Respondents' complaints about the "delay" in adjudicating the motion to dissolve are further undermined by the pending federal indictment in Tennessee. After all, Abrego Garcia must be physically present for that trial to proceed.

Abrego Garcia raises several substantive and procedural arguments that require further exploration for a fair and expeditious resolution. ECF Nos. 142, 144, 145. The motion, therefore, is simply not ripe for resolution.

Accordingly, the Court sets the following schedule:

| | |
|---|---|
| **April 13, 2026** | Respondents' Reply to ECF No. 142 & Response to ECF No. 145 |
| **April 20, 2026** | Petitioner's Reply to ECF No. 145 |
| **April 28, 2026**<br>**At 10:00 AM** | Hearing on Motions, Courtroom 2C, United States District Court for the District of Maryland, Greenbelt |

So Ordered.

Date: April 7, 2026

/s/
PAULA XINIS
United States District Court

**UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
GREENBELT DIVISION**

| | |
|---|---|
| KILMAR ARMANDO ABREGO GARCIA,<br><br>Petitioner,<br><br>v.<br><br>MARKWAYNE MULLIN, Secretary of Homeland Security; TODD BLANCHE, Acting Attorney General; TODD M. LYONS, and NIKITA BAKER,<br><br>Respondents.[1] | Case No. 8:25-CV-02780-PX<br><br>**RESPONDENTS' NOTICE OF APPEAL** |

## NOTICE OF APPEAL

Respondents (the government) hereby appeal to the United States Court of Appeal for the Fourth Circuit the District Court's February 17, 2026, order granting an injunction requiring Petitioner's release (Doc. 141).

The government further appeals from the District Court's constructive denial of its original November 7, 2025, motion to dissolve (Doc. 72), and its March 20, 2026, renewed motion to dissolve (Doc. 142), the District Court's injunctions against removing Petitioner from the United States (Docs. 13, 20). Those injunctions were entered without ever analyzing the likelihood that Petitioner would prevail on the merits or any of the other factors required by *Winter v. NRDC*, 555 U.S. 7 (2009). The first order granting an injunction against removal is a simple docket entry without attachment (Doc. 13), while the second is a letter order issued without reasoning (Doc. 20).

[1] Secretary Markwayne Mullin and Acting Attorney General Todd Blanche are automatically substituted for their predecessors under Federal Rule of Civil Procedure 25(d).

On March 20, 2026, the government "request[ed] the Court enter a ruling on the Motion by Friday, April 17, 2026," and provided notice that "[a]fter that date, the government will consider the motion to dissolve as having been denied." Doc. 142. To date, the District Court has not resolved the motions to dissolve. *See*, *e.g.*, *A.A.R.P. v. Trump*, 605 U.S. 91, 94, 145 S. Ct. 1364, 1367, 221 L. Ed. 2d 765 (2025) (treating "the District Court's inaction" as having the "practical effect of refusing an injunction" giving rise to appellate jurisdiction).

The District Court has thus maintained an injunction against removing Petitioner from the United States for more than seven months without analyzing any of the required *Winter* factors. Although the government "represented Petitioner w[ould] not be removed from the continental United States prior to [a] October 6, 2025, hearing," it did not agree to the open-ended injunction that the district court has kept in place.

Dated: April 17, 2026

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
JONATHAN GUYNN
Deputy Assistant Attorneys General

ERNESTO MOLINA, JR.
Deputy Director
Office of Immigration Litigation

*<u>/s/ Shane A. Young</u>*
SHANE A. YOUNG
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
202-451-7483
Shane.a.young@usdoj.gov

ATTORNEYS FOR RESPONDENTS

**CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2026, I electronically filed the foregoing document via this Court's CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

*/s/ Shane A. Young*
SHANE A. YOUNG
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

KILMAR ARMANDO
ABREGO GARCIA, *

*Petitioner*, *

v. * Civil Action No. 8:25-cv-02780-PX

MARKWAYNE MULLIN, *et al.*, *

*Respondents*. *

***

**MEMORANDUM ORDER**

Pending is Petitioner Kilmar Armando Abrego Garcia's Motion for Indicative Ruling pursuant to Federal Rule of Civil Procedure 62.1(a) on his separate Motion for Discovery. ECF Nos. 145 & 166. The motion is fully briefed and after a hearing, the Court denies the request.

It is axiomatic that a notice of appeal "confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Levin v. Alms & Assocs., Inc.*, 634 F.3d 260, 263 (4th Cir. 2011) (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982)). The district court must not reach "those aspects of the case" on appeal, *id.*, so as to "foster[] judicial economy and guard[] against the confusion and inefficiency that would result if two courts simultaneously were considering the same issues," *Doe v. Pub. Citizen*, 749 F.3d 246, 258 (4th Cir. 2014). Thus, to the extent Abrego Garcia's discovery motion concerns the same "aspect of the case" as the pending interlocutory appeal, ECF No. 163, the Court must refrain from deciding the motion.

Clearly, the discovery motion concerns the Respondents' Motion to Dissolve. ECF No. 145. Abrego Garcia specifically sought discovery on Respondents' new information supplied with the dissolution motion concerning his removal to Liberia over his chosen country, Costa Rica.

ECF Nos. 142 & 145. But before this Court could rule on the Motion to Dissolve, or even have a hearing on it, Respondents took an interlocutory appeal of this Court's purported "constructive denial" of the motion. ECF No. 163 at 1. Accordingly, the discovery motion is related to the pending appeal, and by extension, the Court lacks jurisdiction to reach it.

Abrego Garcia argues, however, that because the appeal of the "constructive denial" of the dissolution motion is itself frivolous, the Court may disregard the appeal and reach his discovery motion. ECF No. 166 at 1. Certainly, Respondents' appeal seems frivolous. The Court never decided the Motion to Dissolve, which was filed less than a month before Respondents noted their appeal. *Compare* ECF No. 142 (Motion to Dissolve filed March 20, 2026), *with* ECF No. 163 (Notice of Appeal filed April 17, 2026). Nor did the Court sit on its hands on the propriety of dissolution, as Respondents claim.[1] Last, Respondents could cite no precedent that permits a party to unilaterally determine when a district court has adjudicated a motion for purposes of appeal.

But while this Court may agree that the appeal is frivolous, this does not mean that the Court can or should reach matters related to the appeal as a result. *Cf. United States v. Montgomery*, 262 F.3d 233, 240 (4th Cir. 2001) (recognizing narrow "dual jurisdiction" rule that allows a criminal trial to proceed even where the defendant pursues a double jeopardy appeal) (collecting cases). After all, the Fourth Circuit can decide if the appeal is frivolous and can even sanction Respondents if the Court sees fit. *See, e.g.*, *In re Prop. Movers, LLC*, 31 F. App'x. 81,

---

[1] The Court enjoined Abrego Garcia's removal from the United States as of August 25, 2025. ECF No. 13; ECF No. 14 at 8:12–16. Respondents preserved their objection to the injunction, and even separately sought dissolution in November 2025, ECF No. 72, but for various reasons, also agreed that removal was neither imminent nor lawful over the ensuing months. *See* ECF No. 148 (including full timeline of events related to Respondents' position on dissolution). Respondents agreed not to press the injunction until the Court could hear the Petition. ECF No. 24 at 21:4–12 (counsel for Respondents confirming that they "will not remove Mr. Abrego during the pendency of this matter, at least through the hearing, if not through [the Court's] decision"). Respondents also conceded removal was not lawful absent a final removal order, which did not exist until January 12, 2026. ECF No. 107 at 156:20–24; ECF No. 110; ECF No. 141. Once the removal order was in place, Respondents filed a new motion on March 20, 2026 to dissolve the injunction, but refused to wait for this Court's ruling. ECF Nos. 142, 148 & 163.

83 (4th Cir. 2002); FED. R. APP. P. 38. Were this Court to reach the same issue, it would sow the very confusion and inefficiency that the divestment rule aims to avoid. *See Pub. Citizen*, 749 F.3d at 258. Thus, because the discovery motion is related to the Motion to Dissolve, this Court lacks jurisdiction over it.

Which brings the Court to Abrego Garcia's request for an indicative ruling on his discovery motion. ECF Nos. 145 & 166. Abrego Garcia argues that because this Court's decision on the propriety of his request for discovery would aid the Fourth Circuit on the merits of the appeal, the Court should indicate how it would rule on the discovery motion now. ECF No. 166 at 2. Federal Rule of Civil Procedure 62.1(a) certainly permits the Court to do so. *See also Daulatzai v. Maryland*, 340 F.R.D. 99, 104 (D. Md. 2021). But this Court's subjunctive ruling on an important but narrow discovery request bears little resemblance to the core issue facing the Fourth Circuit: whether an interlocutory appeal of an undecided motion to dissolve can even proceed. Thus, the Court does not believe an indicative ruling would advance the Fourth Circuit's decisional process.

Second, the discovery request is equally if not more relevant to the underlying merits of the habeas Petition. The interlocutory appeal of the Motion to Dissolve the injunction barring Abrego Garcia's removal from the United States does not divest the Court from reaching the merits of the underlying claims in the Petition. *See CASA, Inc. v. Trump*, 791 F. Supp. 3d 606, 612 (D. Md. 2025) (collecting cases). The Court has yet to adjudicate three such claims. The requests are plainly relevant to Abrego Garcia's constitutional challenges to Respondents' demand for removal to Liberia over Costa Rica. Accordingly, if the claims are justiciable,[2] the Court could grant such discovery as part of the merits proceedings. *See* FED. R. CIV. P. 62.1, advisory committee's note

[2] At the hearing on the Motion for Indicative Ruling, Respondents agreed that the absence of a final order of removal for Abrego Garcia rendered three of the five claims in the Petition, and the arguments concerning this Court's jurisdiction over them, not ripe for review until recently. *See* ECF No. 176 at 45:15–47:25.

to 2009 amendment ("If the district court concludes that it has authority to grant relief without appellate permission, it can act without falling back on the indicative ruling procedure."). Thus, should Abrego Garcia refile his discovery request as part of the merits proceedings, the Court can and will adjudicate that motion, obviating the need for an indicative ruling.

For these reasons, the Motion for Indicative Ruling under Federal Rule of Civil Procedure 62.1 is **DENIED**.

Dated: May 18, 2026

/s/
PAULA XINIS
United States District Judge