**No. 26-6466**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

KILMAR ABREGO GARCIA,
Petitioner-Appellee,

v.

MARKWAYNE MULLIN, in his official capacity as
Secretary of Homeland Security, *et. al.*,
Respondents-Appellants.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
District Court Case No. 8:25-cv-02780-PX

---

# OPENING BRIEF FOR RESPONDENTS-APPELLANTS

---

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General
Office of Immigration Litigation

ERNESTO H. MOLINA, JR.
Deputy Director
Dep't of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Phone: 202-616-9344
Ernesto.H.Molina@usdoj.gov

## TABLE OF CONTENTS


INTRODUCTION .... 1

STATEMENT OF JURISDICTION AND TIMELINESS .... 4

STATEMENT OF THE ISSUE .... 4

STATEMENT OF THE CASE .... 4

I. Statutory Framework .... 4

II. Procedural History .... 6

A. Petitioner Illegally Enters the United States and Concedes Removability. .... 6

B. The District Court Enjoins Petitioner's Removal .... 7

C. The Immigration Judge Denied Petitioner's Motion to Reopen Removal Proceedings .... 8

D. The District Court Granted Petitioner's Habeas Petition and Ordered his Release from Detention. .... 9

E. The Immigration Judge issued a new order of removal for Petitioner. .... 12

F. The District Court Enjoins the Government from Re-Detaining Petitioner. .... 13

SUMMARY OF THE ARGUMENT .... 14

ARGUMENT .... 17

I. The District Court Erred By Enjoining The Future Detention of Petitioner When the District Court Created the Obstacle to His Removal .... 17

A. Petitioner's detention does not implicate the *Zadvydas* framework because he secured an injunction thwarting his removal. .... 17

B. Even if the *Zadvydas* framework applied, Petitioner has not been in immigration detention for the presumptively constitutional six-month period. .... 21

C. The District Court Clearly Erred In Holding That The Government Had Not Established SLRRFF. .... 31

CONCLUSION .... 38

# TABLE OF AUTHORITIES

Page(s)

Cases

*Akinwale v. Ashcroft*,
287 F.3d 1050 (11th Cir. 2002) .......... 29

*Ambimola v. Ridge*,
181 F. App'x 97 (2d Cir. 2006) .......... 29

*Banoub v. Crawford*,
819 F. Supp. 3d 477 (E.D. Va. 2025) .......... 36

*Castaneda v. Perry*,
95 F.4th 750 (4th Cir. 2024) .......... 2, 15, 19, 20, 21, 32, 33

*Douglas v. Baker*,
812 F. Supp. 3d 525 (D. Md. 2025) .......... 36

*Glossip v. Gross*,
576 U.S. 863 (2015) .......... 4

*Guo Xing Song v. U.S. Atty. Gen.*,
516 F. App'x 894 (11th Cir. 2013) .......... 29

*Guzman Chavez v. Hott*,
940 F.3d 867 (4th Cir. 2019) .......... 29

*Hussen v. Bondi*,
135 F.4th 150 (4th Cir. 2025) .......... 16

*Johnson v. Guzman Chavez*,
594 U.S. 523 (2021) .......... 23

*Lawrence v. Gonzales*,
446 F.3d 221 (1st Cir. 2006) .......... 29

*Legend Night Club v. Miller*,
637 F.3d 291 (4th Cir. 2011) .......... 17

*Mayor of Baltimore v. Azar*,
973 F.3d 258 (4th Cir. 2020) .......... 16, 17

*Menghua Wan v. Crawford*,
No. 1:13CV1473, 2014 WL 970180 (E.D. Va. Mar. 12, 2014) .......... 37

*Miranda v. Garland*,
34 F.4th 338 (4th Cir. 2022) .......... 20

*Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*,
139 F.4th 404 (4th Cir. 2025) .......... 16

*Roach v. Holder*,
344 Fed.Appx. 945 (5th Cir. 2009) .......... 29

*Rodriguez-Guardado v. Smith*,
271 F. Supp. 3d 331 (D. Mass. 2017) .......... 29
*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 1
*Zadvydas v. Davis*,
533 U.S. 678 (2001) ....... 1, 2, 3, 11, 13, 14, 15, 17, 18, 19, 20, 21, 22, 23

Statutes

8 U.S.C. § 1231 .......... 29, 30
8 U.S.C. § 1231(a) .......... 18, 22
8 U.S.C. § 1231(a)(1)(A) .......... 5
8 U.S.C. § 1231(a)(1)(B) .......... 5
8 U.S.C. § 1231(a)(1)(C) .......... 5, 26
8 U.S.C. § 1231(a)(2) .......... 6
8 U.S.C. § 1231(a)(3) .......... 6
8 U.S.C. § 1231(a)(6) .......... 6
8 U.S.C. § 1231(b)(3)(B) .......... 31
8 U.S.C. § 1252(a)(5) .......... 1, 3
8 U.S.C. § 1252(g) .......... 1
28 U.S.C. § 1292(a)(1) .......... 4

Regulations

8 CFR § 1241.1(c) .......... 12

## INTRODUCTION

The Executive has now long stood ready and able to remove Petitioner-Appellee Abrego Garcia ("Petitioner") to Liberia. The *only* remaining obstacles to its ability to do so were those unlawfully created by the district court at Petitioner's behest. Specifically, the district court entered a preliminary injunction against his removal in *August 2025* and has, to date, never analyzed the required preliminary injunction factors of *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008), in the ensuing year since the government filed its first opposition brief in this case. Nor has the district court ever explained how its injunction against removal is not independently barred by both 8 U.S.C. § 1252(g) and § 1252(b)(9). It plainly is by both. As this Court is amply aware due to the hundreds of requests it receives every year, jurisdiction to stay removal orders is vested exclusively in *circuit courts*, not district courts. *See* 8 U.S.C. § 1252(a)(5), (b)(9).

But despite Petitioner being the sole remaining cause of the delay of his own removal by seeking and securing an unlawful injunction against it, Petitioner remarkably complained that his detention had become unlawful *Zadvydas v. Davis*, 533 U.S. 678 (2001), because his

removal was taking too long. And even more remarkably, the district court accepted that claim *without mentioning that injunction against removal*. JA1–JA10.[1]

All of this was patent error. Petitioner's detention does not even implicate the *Zadvydas* framework because there is no risk of indefinite or permanent detention. All parties agree that a country exists willing to accept Petitioner and his detention will only be pending removal to such country. That Petitioner has secured an injunction against his removal does not make any detention pending removal indefinite; those proceedings will have an end-point and with them Petitioner's detention upon removal. *See Castaneda v. Perry*, 95 F.4th 750, 756-57 (4th Cir. 2024). Petitioner cannot complain that his detention has been extended because *he* was the one that successfully acted to stay his own removal.

But even assuming that Petitioner could obtain relief based on delay for which he was the cause, the district court still erred in granting relief under *Zadvydas* because (1) Petitioner has not been detained in immigration custody for the presumptively reasonable six-month period set forth in *Zadvydas*, and (2) the government easily established that

---

[1] Extra zeros in the Bates Numbers are omitted for ease of reading.

there was a "significant likelihood of removal in the reasonably foreseeable future" ("SLRRFF"), thus continued detention was lawful under *Zadvydas*. 533 U.S. at 701.

Nor was Petitioner without remedy. Petitioner had proper channels that he could have employed to challenge his removal, including the designation of Liberia as the country of removal. After the district court found his original removal order deficient, a corrected order was issued on December 11, 2025 that expressly permitted him to appeal that order to the Board of Immigration Appeals ("BIA"). JA1345–JA1349. And if the BIA had ruled against him, Petitioner could have sought review in this Court by petition for review. 8 U.S.C. § 1252(a)(5).

But Petitioner had no interest in pursuing the mechanisms that Congress provided to challenge his removal. Instead, he ostentatiously refused to file an appeal with the BIA and instead elected to pursue his jurisdictionally-barred-multiple-times-over habeas challenge in the district court alone. *See, e.g.*, JA1332. And that to date has been successful: securing an injunction against removal that has now festered for 13 months. And with that unlawful injunction delaying his removal, he then further secured release from detention on the basis that his

removal was unlawfully taking too long. That approach "calls to mind the man sentenced to death for killing his parents, who pleads for mercy on the ground that he is an orphan." *Glossip v. Gross*, 576 U.S. 863, 898 (2015) (Scalia, J., concurring).

Because Petitioner failed to establish that the (self-secured) delay of his removal rendered his detention unlawful, this Court should reverse the district court's release order. And when the injunction against his removal reaches this Court, it should reverse that injunction too.

## STATEMENT OF JURISDICTION AND TIMELINESS

The district court entered its preliminary injunction on February 17, 2026. JA1. The government filed a timely notice of appeal of this order on April 17, 2026. JA1478. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in enjoining the government from re-detaining Petitioner for purposes of removal.

## STATEMENT OF THE CASE

### I. Statutory Framework

The Immigration and Nationality Act ("INA") directs the Executive to promptly remove aliens with final orders of removal and provides for

the detention of such aliens pending the execution of their removal orders. Section 1231 of Title 8 creates a "removal period" within which the Executive must remove an alien with a final order of removal:

> Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period").

8 U.S.C. § 1231(a)(1)(A). This statutory "removal period" begins "on the latest of the following:

> (i) The date the order of removal becomes administratively final.
> (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.
> (iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement."

8 U.S.C. § 1231(a)(1)(B).

The INA further provides for the detention of an alien after entry of a final order of removal. Detention is mandatory during the removal period: "During the removal period, the Attorney General shall detain the alien." 8 U.S.C. § 1231(a)(2). If an alien is not removed within the removal period, he or she *may* be released under supervision. 8 U.S.C. § 1231(a)(3). However, an alien who is "inadmissible under section 1182 of

[Title 8]," who is deportable on certain grounds, or who "has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained *beyond* the removal period …." 8 U.S.C. § 1231(a)(6) (emphasis added).

The statute's calculation of the "removal period" takes into account aliens' efforts to delay or prevent the execution of their removal orders. To prevent aliens from running out the statutory "removal period" with dilatory tactics, Section 1231 provides that "[t]he removal period *shall be extended*…if the alien … acts to prevent the alien's removal subject to an order of removal." 8 U.S.C. § 1231(a)(1)(C) (emphasis added). That is precisely what happened here.

## II. Procedural History

### A. Petitioner Illegally Enters the United States and Concedes Removability.

Petitioner is a citizen of El Salvador who entered the United States illegally in 2012. JA28. In 2019, U.S. Customs and Immigration Enforcement ("ICE") took Petitioner into custody, served him with a Notice to Appear ("NTA")—the immigration court charging document—and, upon filing the NTA with the immigration court, and commenced removal proceedings. JA29. Petitioner admitted the allegations in the

NTA, conceded removability, and designated El Salvador as the country of removal. JA29, JA1460–JA1461. However, Petitioner also filed an application for withholding of removal to El Salvador. JA29, JA115. The immigration judge found Petitioner removable, JA1460–JA1461, but granted his application for withholding of removal from El Salvador. JA29, JA40, JA115.

### B. The District Court Enjoins Petitioner's Removal

In March 2025, Petitioner was detained by ICE and removed to El Salvador. JA11. After a district court ordered his return to the United States, he was brought back to the United States in June and placed in criminal custody under an indictment for human trafficking under 8 U.S.C. § 1324(a)(1)(A). JA24. After Petitioner was granted bond in the criminal proceedings, ICE ordered Petitioner to report to an ICE facility in Baltimore, Maryland for purposes of being removed to Uganda. JA20. On August 25, 2025, ICE took Petitioner into custody for purposes of removal. JA21. That same day, Petitioner filed a petition for a writ of habeas corpus challenging the lawfulness of his detention. JA11. The district court immediately issued an oral order, JA1489 (*see* Dkt. No. 13),

and a letter order, JA77, enjoining the government "from removing the Petitioner from the continental United States."

In an evidentiary hearing on October 10, 2025, the district court stated that if the government were in a position to effectuate removal, it could move to dissolve the order enjoining removal. ("[A]t any point you can ask me to modify, dissolve, end…the injunction."). JA682. Taking the district court up on that suggestion, the government filed its first motion to dissolve the injunction against removal on November 7, 2025. JA1493 (*see* Dkt. No. 72).

### C. The Immigration Judge Denied Petitioner's Motion to Reopen Removal Proceedings

On the same day he filed his habeas petition, Petitioner also pursued a motion to reopen before the immigration judge. *See* JA113. His motion sought reopening to pursue asylum based on changed circumstances relating to El Salvador. JA114–JA115. Further, he asked for reopening for the purpose of designating Costa Rica as his country of removal in lieu of his previous designation of El Salvador. JA124–JA125. On October 1, 2025, the immigration judge denied the motion to reopen. *See* JA581. Petitioner appealed that decision to the BIA. *See* JA1360.

### D. The District Court Granted Petitioner's Habeas Petition and Ordered his Release from Detention.

On September 5, 2025, the government notified Petitioner of its intent to remove him to Eswatini, rather than Uganda. JA110. This notification also acknowledged Petitioner's claimed fear of persecution and torture if removed to 22 countries, *including Costa Rica*, which he himself had designated as a country of removal less than two weeks prior. JA110. On October 10, 2025, the district court held an evidentiary hearing to assess the government's efforts to remove Petitioner to Eswatini. *See* JA648. At the hearing, the Court examined documentation and witness testimony regarding potential removal of the Petitioner. JA648. Further, the government offered testimony that that no travel documentation is required to remove an alien to a third country, JA805–JA806 ("In [Mr. Schultz's] experience, we don't need a travel document to send somebody back to a third country."); *see also* JA701–JA705 (discussing manifest procedures and potential removal in 72 hours).

On October 24, 2025, the government filed notice with the district court that the government of Liberia has agreed to accept the Petitioner and had relayed diplomatic assurances regarding his treatment and status. *See* JA905; *see also* JA987. Likewise, on October 24, 2025, the

government notified Petitioner, through counsel, that he would be removed to Liberia if the government were permitted to do so. JA913.

On October 24, 2025, Petitioner communicated a fear of removal to Liberia, prompting a screening by U.S. Citizenship and Immigration Services ("USCIS"). JA913. USCIS performed that screening on October 28, 2025, and concluded that Petitioner had not demonstrated that it was more likely than not that he would be persecuted or tortured in Liberia. JA1533 (Dkt. No. 73-4 (sealed)). The government also provided, under seal, the Secretary of Homeland Security's decision regarding Liberia, the Department of State's credibility letter, and Liberia's diplomatic assurances of Petitioner's safety and nonrefoulement to El Salvador. *See* JA905–JA906; JA1547–JA1549; JA1551–JA1552; JA1554–JA1555 (Dkt. Nos. 56, 75-1 (sealed), 75-2 (sealed), 75-3 (sealed)).

On December 11, 2025, the district court granted Petitioner's habeas petition and ordered that he be immediately released. JA1301. The district court held that the immigration judge never actually entered a final order of removal for Petitioner—a prerequisite for the government's statutory authority to detain aliens pending removal under § 1231(a)(6). JA1313. In particular, the district court reasoned that while

the immigration judge's order from October 10, 2019, denied Petitioner's applications for asylum and protection under regulations implementing U.S. obligations under the Convention Against Torture and granted his application for statutory withholding of removal to El Salvador, it did not explicitly "order [that] Petitioner [be] removed to El Salvador or anywhere else." JA1319.

The district court also held that "continued detention appear[ed] constitutionally infirm under *Zadvydas v. Davis*, 533 U.S. 678 (2001)," even as the court recognized that "*Zadvydas* is an imperfect fit" given the court's holding that Petitioner did not have a final order of removal. JA1323, JA1325. The district court reasoned that Petitioner's continued detention conflicted with "the[] principle[] of *Zadvydas*" that detention after an order of removal is valid only to facilitate eventual removal. JA1325. The court thought that the government's continued detention of Petitioner "was not for the 'basic purpose' of timely third-country removal," because the government had not removed him to Costa Rica—his preferred country of removal—even though it "could have [done so] as early as August 21, 2025." JA1325–JA1326. The district court did not acknowledge its August 27, 2025, order enjoining the government from

"removing Petitioner from the continental United States," JA77, nor that it had not ruled on the government's November 7 motion to dissolve that injunction, JA1493 (*See* Dkt No. 72).

### E. The Immigration Judge Issued a New Order of Removal for Petitioner.

The government released Petitioner from ICE custody in compliance with the district court's decision of December 11, 2025. That same day, the immigration judge issued an order of removal *nunc pro tunc*, to be effective October 10, 2019. JA1345–JA1349. That order specifically provided that Petition could appeal that decision to the BIA ("This decision is final unless an appeal is filed with the Board of Immigration Appeals within 30 calendar days of the date of the mailing of this written decision."). JA1345.

Petitioner expressly disclaimed taking an appeal to the BIA ("Neither party appealed the issuance of the nunc pro tunc order, and it became final on January 12, 2026."). JA2. The reissued removal order thus became administratively final on January 12, 2026, when the deadline to appeal expired. *See* 8 CFR § 1241.1(c). On December 17, 2025, the Board dismissed Petitioner's appeal from the denial of his motion to reopen his prior immigration proceedings. *See* JA1360.

### F. The District Court Enjoins the Government from Re-Detaining Petitioner.

The day after he was released from detention, Petitioner filed an emergency motion for a temporary restraining order enjoining his re-detention for purposes of removal. *See* JA1332. Without receiving or ordering a response from the government, the district court granted that motion later that same day. *See* JA1350.

On February 17, 2026, the district court converted the temporary restraining order into a preliminary injunction, holding that re-detaining Petitioner would violate *Zadvydas*. JA7–JA9. First, the court reasoned that because the immigration judge's December 11, 2025, order states that the removal order is effective as of October 10, 2019, then the statutory removal period triggered by a final order of removal "was over long ago." JA7. Second, the court incorporated the conclusion from its previous order that the government had not shown that removal of Petitioner was "reasonably foreseeable," such that further detention after the statutory removal period is allowed consistent with *Zadvydas*. JA7–JA9. To that end, the court acknowledged Liberia's willingness to accept Petitioner but expressed concern over the government's previous consideration of Petitioner's removal to "various [other] countries" as

"undermining the reliability of Liberia itself as a legitimate option" (citing the government's January 2026 briefing). JA8, JA1451.

Once again, the district court failed to acknowledge (much less rule on) the government's pending motion to dissolve the removal injunction. JA1–JA10. Accordingly, on March 20, 2026, the government filed a renewed motion to dissolve the removal injunction, requesting a decision by April 17, 2026. JA1499 (*see* Dkt. No. 142). The district court did not rule upon either the government's original or renewed motions to dissolve the injunction against removal before the government sought appeal.

The government timely appealed the district court's February 17 injunction against re-detention. *See* JA1478.[2]

## SUMMARY OF THE ARGUMENT

The government presents one issue on appeal: whether detention of Petitioner pending removal to Liberia has become unlawfully protracted under *Zadvydas v. Davis,* 533 U.S. 678 (2001).

---

[2] The government also appealed the district court's constructive denial of its motions to dissolve the injunction against removal. This Court dismissed that appeal for lack of jurisdiction. There is a hearing scheduled in the district court on October 6, 2026 to address pending matters, including the motion to dissolve. JA1503 (*See* Dkt. No. 193).

First, the district court's analysis rests upon a flawed understanding of the Supreme Court's decision in *Zadvydas*. That decision's framework applies only to aliens subject to potentially *indefinite* and *permanent* detention. Further, this circuit's holding in *Castaneda*, 95 F.4th 750, confirms the narrowness of *Zadvydas*'s holding. Thus, the district court erred when it applied a *Zadvydas* analysis to Petitioner's detention, which he himself has prolonged by raising various challenges to removal.

Second, even if this Court concludes *Zadvydas* applies here, Petitioner has not been detained for the presumptively reasonable six months post final order of removal. In fact, he was never detained for even a minute after his order of removal became final in January 2026. Thus, the district court violated *Zadvydas* by reasoning that Petitioner had already been held in detention for longer than the presumptively reasonable six months.

Finally, the district court incorrectly determined that, even if the *Zadvydas* period has expired, there was not a significant likelihood of removal in the reasonably foreseeable future ("SLRRFF"). The district court incorrectly concluded that Petitioner's purported designation of

Costa Rica as a country of removal changed the SLRRFF analysis; relied on an outdated citation that the government was actively exploring "various countries" apart from Liberia; and overemphasized the importance of the absence of travel documents to Liberia. JA8. Liberia and the United States have reached an agreement, including assurances of safety and nonrefoulement to El Salvador, and Liberia has publicly announced its willingness to receive Petitioner. *See* JA905, JA987. Thus, the district court abused its discretion in entering an injunction against Petitioner's future detention on this basis.

## STANDARD OF REVIEW

A grant of injunctive relief is reviewable on appeal for abuse of discretion. *Mayor of Baltimore v. Azar*, 973 F.3d 258, 274 (4th Cir. 2020). An "exacting standard" is applied, meaning that the district court judge's discretion is not boundless and must be tied to applicable rules of law. *See 2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*, 139 F.4th 404, 409 (4th Cir. 2025). "[L]egal error necessarily constitutes an abuse of discretion." *Hussen v. Bondi*, 135 F.4th 150, 159 (4th Cir. 2025). Legal conclusions are reviewed *de novo*, and factual findings are reviewed

for clear error. *Mayor of Baltimore*, 973 F.3d at 274 (citing *Legend Night Club v. Miller*, 637 F.3d 291, 297 (4th Cir. 2011)).

## ARGUMENT

### I. The District Court Erred By Enjoining The Future Detention of Petitioner When the District Court Created the Obstacle to His Removal.

The district court erred in entering injunctive relief barring the government from re-detaining Petitioner for the purposes of effectuating removal. JA9–JA10. This Court should vacate the injunction against detention for the following three reasons: (1) Petitioner's detention does not even implicate the *Zadvydas* framework, as it does not raise any concern of indefinite or permanent detention; (2) even if *Zadvydas* applied, Petitioner has not been detained for the presumptively permissible six-months under *Zadvydas*; and (3) the Government has established SLRRFF in any event.

#### A. Petitioner's detention does not implicate the *Zadvydas* framework because he secured an injunction thwarting his removal.

The district court's injunction against Petitioner's detention is premised on a flawed understanding of the Supreme Court's decision in *Zadvydas*. That decision's framework applies only to aliens subject to potentially *indefinite* and *permanent* detention, not those (like Petitioner)

whose detention is being prolonged by challenges to removal they themselves initiated and would be pending the outcome of those proceedings with a definite end point.

In *Zadvydas*, the Supreme Court addressed whether 8 U.S.C. § 1231(a) "authorizes the [Executive] to detain a removable alien *indefinitely* beyond the removal period." 533 U.S. at 682. The two aliens in that case had final orders of removal, but their countries of origin (as well as other countries) refused to accept them. *Id.* at 684-86. Although the Court acknowledged that § 1231(a) does not place a temporal limit on the length of detention, it "read an implicit limitation into the statute," because it concluded that "[a] statute permitting *indefinite* detention of an alien would raise a serious constitutional problem." *Id.* at 689-90 (emphasis added).

Indeed, the Court's decision is littered with references to its concern for "indefinite" and "permanent" detention. *See id.* at 682, 685, 690, 691. In that context, the Court held that detention under § 1231(a) is limited to "a period reasonably necessary to secure removal," which it concluded to be presumptively six months. *Id.* at 699-700. "After this 6-month period, once the alien provides good reason to believe that there is no

significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* But the Court was clear that "[t]his 6-month presumption, of course, does not mean that every alien must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

This Court's decision in *Castaneda*, 95 F.4th 750, confirms the narrowness of *Zadvydas*'s holding. There, an alien was given a final order of removal but placed in withholding-only proceedings based on his asserted fear of removal to El Salvador. *Id.* at 753. Those proceedings lasted years. During that time the alien was detained under § 1231(a) and eventually challenged his detention under *Zadvydas*. *Id.* at 753-54. This Court rejected that claim. It acknowledged that "Vasquez Castaneda's post-removal-period detention … ha[d] exceeded the presumptively reasonable six-month period," but held that the protracted duration of the alien's withholding-only proceedings did not establish that "there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 756 (quoting *Zadvydas*, 533 U.S. at 701). That

argument, this Court held, "overlook[ed] key factual context that readily distinguishes [t]his case." *Id.*

In particular, this Court explained that "it was th[e] specific circumstance—the possibility of 'indefinite' and *potentially permanent*' civil confinement—that led the [Supreme] Court to read an implicit 'reasonable-time limitation into § 1231(a)." 95 F.4th at 757. But "Vasquez Castaneda's detention simply [wa]s not the type of 'indefinite and potentially permanent' detention at issue in *Zadvydas*," because he was "being detained pending the completion of his withholding-only proceedings *that he voluntarily initiated*." *Id.* (emphasis added); *see also id.* at 758 (noting that "Vasquez Castaneda voluntarily initiated withholding[]-only proceedings, bringing his removal to an immediate halt"). And the Court made clear that "*Zadvydas* should not be extended beyond the context of the *indefinite and potentially permanent* detention involved there." *Id.* (quoting *Miranda v. Garland*, 34 F.4th 338, 361 (4th Cir. 2022)).

As in *Castaneda*, Petitioner's detention was (and would be) nothing like the "*indefinite and potentially permanent* detention involved" in *Zadvydas*. 95 F.4th at 757. Unlike the aliens in *Zadvydas*, Petitioner is

not facing the possibility of "indefinite" or "permanent" detention. 533 U.S. at 682, 685, 690, 691. All agree he has a final order of removal and both he and the government maintain that there are countries that will accept him. The only barrier to his removal to one of those countries is the district court's August 27, 2025, injunction against removal—an injunction he voluntarily sought from the district court. *See* JA1; *see also* JA11. If he were detained, it would only be pending resolution of these proceedings—proceedings that, like the withholding-only proceedings in *Castaneda*, have a definite end point. Indeed, the district court has scheduled a hearing for October 6, 2026, to consider the government's motion to dissolve the removal injunction. JA1503 (*See* Dkt. No. 193).

Under this Court's precedent, *Zadvydas* has no role to play in these circumstances, and the district court thus erred in enjoining Petitioner's detention based on *Zadvydas*.

### B. Even If the *Zadvydas* Framework Applied, Petitioner Has Not Been In Immigration Detention for the Presumptively Constitutional Six-Month Period.

The district court's injunction is still unlawful even if the *Zadvydas* framework applied here. Since his return to the United States in June 2025, Petitioner has not been held in *immigration* detention for

anywhere near the presumptively constitutional six-month period allowed under *Zadvydas*. In fact, he was *never* detained after his order of removal became final. And even if Petitioner's detention in 2019 and his criminal custody could be relevant to the *Zadvydas* clock, the immigration judge's new order of removal restarted the removal period under § 1231(a).

*Zadvydas* held that detention under § 1231(a) is presumptively permissible for a six-month period, consisting of the initial 90-day "removal period" under § 1231(a) and an additional 90 days. 533 U.S. at 701; *see* 8 U.S.C. § 1231(a). The initial 90-day "removal period," however, does not begin until "the latest" of several events, including "[t]he date the removal order becomes administratively final." 8 U.S.C. § 1231(a)(1)(B)(i).

Here, the district court found that there was no order of removal prior to December 11, 2025, JA2, but that problem (assuming the district court was correct) was remedied by the immigration judge's entry of an order of removal on December 11, 2025, JA1301. That order of removal became final on January 12, 2026, when Petitioner failed to appeal it to the BIA within the 30-day window, and so Petitioner's statutory "removal

period" under § 1231(a) did not start until that time. *See* 8 U.S.C. § 1231(a)(1)(B)(i); *see also Johnson v. Guzman Chavez*, 594 U.S. 523, 528-29 (2021).

Thus, under *Zadvydas*, the Government could lawfully detain Petitioner under § 1231(a) for six-months *after* January 12, 2026. The district court, however, ordered Petitioner's release from detention, even though he did not spend *even one day* in immigration detention (or any detention) after January 12. That holding flouts *Zadvydas* and § 1231(a).

The district court acknowledged the December 11, 2025 order of the immigration judge did not become administratively final until January 12, 2026. JA2. Nonetheless, the court reasoned that the administrative finality of the December 11 order did not determine the administrative finality of the October 2019 order granting withholding of removal. *See* JA4. That makes no sense. The district court held that the October 2019 order *was not an order of removal at all*, and it ordered Petitioner's release on that basis. JA1317 ("No such order of removal exists for [Petitioner]."). The December 11 decision of the immigration judge *supplied* the missing order of removal. JA1348 ("The Immigraton Court now corrects that scrivener's error and amends the written decision in

this case by adding" an order of removal). The order of removal thus became administratively final when the order supplying it became administratively final—January 12, 2026.

The lower court thought otherwise because the immigration judge's December 11 order stated that its "corrections" to the October 2019 order were "issued nunc pro tunc to the Immigration Court's written decision and order of October 10, 2019." JA1348. That language, the district court reasoned, meant that the immigration court's order "did no more than add an order of removal effective October 10, 2019, which became administratively final thirty days later." JA6. So according to the district court, on December 10, 2025, Petitioner did not have—and never had—a final order of removal, but on December 11, 2025, Petitioner had a final order of removal *and had one since October 2019.* That rationale is thus at war with itself.

The district court tried to justify this absurd rationale on the theory that a *nunc pro tunc* order cannot "alter substantive rights or rewrite [the] history" of the case. JA6. That is not what the December 11 order does. The district court held that no removal order existed; the December 11 order corrected the deficiencies that the district court had identified

and perfected an order of removal. It is that simple. The fact that the December 11 order was "issued nunc pro tunc," *see* JA1344–JA1349, does not change its fundamental character.

In any event, it is hard to take the district court's concern seriously when the court "accept[ed] the validity" of the December 11 order "as adding an order of removal to the withholding order, effective October 10, 2019." JA5 n.3. If a *nunc pro tunc* order can accomplish *that*, then it is difficult to comprehend what basis the court had to object to it "restart[ing] Respondent's 'removal period' pursuant to § 1231." JA6.

The court justified its inconsistent reasoning because "the parties" (read: Petitioner) "did not appeal" the December 11 order. JA5 n.3. That undermines the district court's holding: Petitioner deliberately chose not to challenge the validity of the December 11 order through the administrative process that Congress specified, JA2, and having made that choice and accepted that the December 11 order lawfully supplied an order of removal, he had no business collaterally attacking that order through a habeas petition.

In effect, the district court's December 11 order created a new administrative avenue for Petitioner to raise any legal or factual concerns

regarding removal to Liberia to the BIA. And if he disagreed with the BIA's decision, the district court secured an avenue for judicial review as well, through a petition for review to this Court. But Petitioner spurned all such opportunities.

The upshot is clear: the December 11 order supplied the order of removal the district court deemed missing, and that order of removal became "administratively final" on January 12, 2026. Because Petitioner was not detained for even one day after January 12, 2026, the district court's injunction against further detention under *Zadvydas* was unlawful.

Even putting aside when the underlying immigration court order became administratively final, both the statutory removal period under 8 U.S.C. § 1231(a)(1) and the presumptively reasonable six-month detention clock established in *Zadvydas* restart as a matter of law upon redetention. The statutory and constitutional limitations on post-removal-order detention are fundamentally tied to active, physical custody. When an alien is released from custody, the primary liberty deprivation that *Zadvydas* regulates is extinguished. Consequently, when the government subsequently redetains the alien to execute a valid,

outstanding removal order, a new period of detention begins. As some courts have held, "the removal-period clock restarts when an alien subject to a removal order is again detained by ICE." *Liu v. Carter*, No. 25-3036-JWL, 2025 WL 1207089, at *2 (D. Kan. Apr. 25, 2025); *see also Abedi v. Carter*, No. 25-3141-JWL, 2025 WL 3209009, at *1 (D. Kan. Oct. 6, 2025) (rejecting petitioner's aggregate detention theory and confirming that *Zadvydas* restarts upon redetention); *Tran v. Warden, Fla. Soft Side S. Det. Ctr.*, No. 2:25-cv-1224-KCD-NPM, 2026 WL 672969, at *8-9 (M.D. Fla. Mar. 10, 2026) (holding that absent bad faith, "the better approach is to afford the government a new six-month presumptively reasonable period for each discrete detention" and that *Zadvydas* does not function as "a Get Out of Jail Free Card that may be redeemed at any time just because an alien was detained too long in the past"). While other courts have reached a contrary conclusion by holding that nonconsecutive periods of post-removal-order detention must be aggregated, *see, e.g.*, *Vo v. Bondi*, No. 2:25-cv-02244, 2025 WL 3653722, at *3 (W.D. Wash. Dec. 17, 2025); *Bulle v. Wesling*, No. 26-cv-019, 2026 WL 183840, at *4 (D.R.I. Jan. 23, 2026), this aggregation approach is legally flawed and practically unworkable because calculating the *Zadvydas* clock cumulatively across

interrupted intervals would automatically make any redetention of a previously released alien unconstitutional, effectively stripping the executive branch of its statutory authority to enforce final removal orders when an individual is located. *See Abedi*, 2025 WL 3209009, at *1. Because the *Zadvydas* inquiry measures the likelihood of removal in the reasonably foreseeable future from the onset of active custody, redetention must trigger a new, presumptively reasonable six-month clock to allow ICE a fair opportunity to secure travel documents. Accordingly, the relevant detention period must be calculated from the date of redetention, independent of when the removal order originally achieved administrative finality.

2. In fact, the statutory removal period under § 1231(a) has not even *begun* to run, as Petitioner's voluntary decision to secure an injunction against his removal tolled the statutory removal period. Section 1231 provides that when an alien has "act[ed] to prevent the alien's removal" then the "removal period shall be extended … and *the alien may remain in detention during such extended period*." 8 U.S.C. § 1231(a)(1)(C) (emphasis added). Petitioner thus cannot complain that his detention has been extended since *he* was the one that successfully

acted to stay his own removal. The district court's failure to consider the fact that Petitioner himself had caused delay of his removal thus violates § 1231(a)(1)(C) as well as *Zadvydas*.

Numerous circuit courts have found that delays attributable to an alien's legal challenges to a removal order extend the removal period. *See Rodriguez-Guardado v. Smith*, 271 F. Supp. 3d 331, 335 (D. Mass. 2017) (citing to *Lawrence v. Gonzales*, 446 F.3d 221, 227 (1st Cir. 2006)); *Roach v. Holder*, 344 Fed.Appx. 945, 947 (5th Cir. 2009); *Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 n.4 (11th Cir. 2002)); *see also Ambimola v. Ridge*, 181 F. App'x 97, 99 (2d Cir. 2006) (rejecting *Zadvydas* claim in part because "the real reason for [petitioner's] lengthy detention" was his "seeking and/or receiving numerous judicial stays and filing his numerous petitions for reconsideration and appeals"); *Guo Xing Song v. U.S. Atty. Gen.*, 516 F. App'x 894, 899 (11th Cir. 2013) ("[t]he six-month period is tolled … if the alien acts to prevent his removal."). This Court itself has called a "judicial stay" a "legal impediment to removal." *Guzman Chavez v. Hott*, 940 F.3d 867, 879 (4th Cir. 2019), *rev'd on other grounds sub nom. Johnson v. Guzman Chavez*, 594 U.S. 523 (2021).

3. The district court's injunction against removal is still unlawful even if the order of removal became administratively final in November 2019. Under § 1231(a), the "removal period begins on the *latest*" of the listed triggering events, including "[i]f the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order." 8 U.S.C. § 1231(a)(1)(B)(ii) (emphasis added).

Here, Petitioner is challenging the lawfulness of his removal under his final order of removal which, according to the district court, has been in effect since October 2019. JA22–JA25. Petitioner's "removal order" is thus being "judicially reviewed." 8 U.S.C. § 1231(a)(1)(B)(ii). And on August 25, 2025, the district court "ordered a stay or the removal," 8 U.S.C. § 1231(a)(1)(B)(ii), by "enjoin[ing]" the Government "from removing Petitioner from the continental United States" "until further order of the Court." JA77. The district court has not yet entered a "final order" on whether Petitioner may be removed, 8 U.S.C. § 1231(a)(1)(B)(ii), and has even refused to rule on the Governments two motions to dissolve the removal injunction, which have been pending since November 7, 2025 and March 20, 2026. JA1493, JA1499 (Dkt. Nos.

72, 142). So the "removal period" under § 1231(a) has not even started and will not start until the district court finally resolves Petitioner's challenges to his removal. That makes one thing crystal clear: Petitioner cannot have been detained in excess of the six-months allowed under *Zadvydas*.

* * *

The district court thus abused its discretion in enjoining Petitioner's detention under *Zadvydas*. If taken into detention today for purposes of effectuating his immediate removal, 8 U.S.C. § 1231 provides clear authorization for Petitioner's detention for at least six months, *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001), providing the government can demonstrate SLRRFF. With Liberia's agreement to take Petitioner, the government can easily establish that.

### C. The District Court Clearly Erred In Holding That The Government Had Not Established SLRRFF.

Even assuming, *arguendo*, that the *Zadvydas* framework applies here and the six-month period has run, the district court still erred in concluding that there was no SLRRFF. The evidence before the district court plainly established that Petitioner could be removed to Liberia in the reasonably foreseeable future but for the district court's injunction

against removal. The source of this delay is directly attributable to Petitioner's own actions. As discussed above, in *Vasquez Castaneda*, the court held petitioner's detention failed to meet the *Zadvydas* limitations because the delay was caused by actions he initiated. The resulting stay created a "legal impediment to removal." *Guzman Chavez v. Hott*, 940 F.3d 879, *rev'd on other grounds sub nom. Johnson v. Guzman Chavez*, 594 U.S. 523.

Under *Zadvydas* and § 1231(a)(6), detention beyond the presumptive six months exceeds statutory authority *only* in "the context of the indefinite and potentially permanent detention." *See Castaneda*, 95 F.4th at 757; *see also Zadvydas*, 533 U.S. at 682, 685, 690, 691. Here, the district court's finding that the government failed to establish SLRRFF was based on its erroneous reliance on: (1) Petitioner's purported designation of Costa Rica as a country of removal; (2) a statement that the government was exploring "various countries" apart from Liberia; and (3) the absence of travel documents to Liberia. JA8.

First, the prospect that removal will occur at all—not the prospect of removal to a specific country—is the relevant benchmark for determining the lawfulness of detention for *Zadvydas* purposes.

Nothing in 8 U.S.C. § 1231 requires release of an alien with a final order of removal until the government can prove the *country* to which the alien will imminently be removed. Petitioner's purported designation of Costa Rica is thus irrelevant to the analysis.

In *Castaneda*, the Fourth Circuit rejected a *Zadvydas* claim and ruled that uncertainty about the country to which the petitioner would be removed did not invalidate the permissibility of his continued detention under § 1231. 95 F.4th 758. It reasoned that "[o]ngoing withholding only proceedings," in which the petitioner sought to avoid removal to his country of origin, "are insufficient to demonstrate that removal is no longer reasonably foreseeable" because "nothing would prevent ICE from removing him to another country" even if he succeeded in obtaining protection against removal to his country of origin. *Id.*

*Castaneda*'s reasoning cannot be reconciled with the district court's holding that detention for purposes of removal to any country but Costa Rica is unlawful and violates *Zadvydas*. But Petitioner's country of removal is not a pre-requisite to the authority to detain him. And any decision of the Executive to disregard this designation is outside of the

Court's jurisdiction. *See* 8 U.S.C. § 1231(b)(3)(B); 8 U.S.C. § 1252(a)(2)(B)(ii).

This district court additionally erred in relying on the outdated fact that the government was exploring "various countries" apart from Liberia to remove Petitioner as a reason why SLRRFF was not established. As of October 2025, the government has identified a specific country—Liberia—as a viable option for Petitioner's removal. JA905–JA906. While the government does not dispute that, *prior* to designating Liberia, it explored other countries to which Petitioner could be removed—not an unusual part of the removal process—Liberia has since publicly announced its willingness to accept Petitioner and reached an agreement with the United States which includes assurances of safety and nonrefoulement to El Salvador. JA905–JA906.

In contrast, the district court contended that the government "more recently … asserted that they are pursuing removal to 'various countries' apart from Liberia, thus undermining the reliability of Liberia itself as a legitimate option." JA8. However, the quote relied on by the district court in making this assertion originally stems from Petitioner's brief from

November 2025 explaining the earlier stages of litigation in this case.[3] It was therefore erroneous, misleading, and an abuse of discretion for the district court to conclude—based on a reference made by Petitioner in an *older* filing—that the government failed to establish SLRRFF.

Finally, the district court's reliance on the absence of travel documents for removing Petitioner to a third country was not a legitimate basis to find that SLRRFF had not been established. JA8. The government presented uncontroverted testimony to the district court that in removals to third countries, travel documents are unnecessary. JA805–JA806 ("In [Mr. Schultz's] experience, we don't need a travel document to send somebody back to a third country."); *see also* JA701–JA705 (discussing manifest procedures and potential removal in 72 hours).

---

[3] The quoted fact that the government was "pursuing removal to 'various countries' apart from Liberia in the district court's February ruling, per the court's citation, stems from the government's supplemental briefing from January 2026. JA1452. The quote from the January 2026 brief in context reads: "*As acknowledged by Petitioner*, the government is actively working to remove him to various countries—including Liberia, which has agreed to take him." (emphasis added). This quote then cites to Petitioner's brief filed in November 2025, see JA945–JA946, which discussed the government's designations of other countries of removal prior to its designation of Liberia.

Thus, the absence of travel documents has no bearing on the likelihood of removal in the reasonably foreseeable future to Liberia. Even if travel documents *were* required in this specific instance, it does not follow that the absence of those documents means that SLRRFF is not established and that detention is impermissibly indefinite and permanent under *Zadvydas*. Nothing in *Zadvydas* requires that removal be immediately imminent; the test is whether removal is likely in the "reasonably foreseeable future." 533 U.S. at 701. And Petitioner did not present any evidence to the district court to show that obtaining travel documents for an individual aliens a third country has agreed to accept is a time-consuming enterprise.

The district court relied on two district court decisions, but neither one supports its injunction. JA9. In *Banoub v. Crawford*, 819 F. Supp. 3d 477, 488 (E.D. Va. 2025), the court found that SLRRFF was not present where ICE did not have any evidence or assurances from any third country that it would accept the petitioner. In *Douglas v. Baker*, 812 F. Supp. 3d 525, 531 (D. Md. 2025), the court found no evidence that the third-party country had agreed to accept the petitioner nor evidence that

the government was actively pursuing efforts to remove the petitioner to that third-party country.

Both cases are readily distinguishable. Here Liberia has publicly and unequivocally stated its willingness to accept Petitioner with assurances of safety and nonrefoulement to El Salvador. *See* JA905–JA906; JA1547–JA1549 (sealed); JA1551–JA1552 (sealed); JA1554–JA1555 (sealed).

This Court should instead be guided by the holding in *Menghua Wan v. Crawford*, No. 1:13CV1473, 2014 WL 970180 (E.D. Va. Mar. 12, 2014). In that case, the court found that where, as here, a third-party country indicated its willingness to accept the petitioner, it was reasonable to assume that it would accept him when the stay of removal that was in place was lifted. *Id.* at *4. Similarly, here, Liberia has publicly expressed its willingness to accept Petitioner, and it is therefore reasonable to infer that it will accept Petitioner when the stay of removal is lifted. *Id.* ("Courts have held that removal was 'reasonably foreseeable' when, for example, ICE was taking active steps to secure removal at some point in the future, which included seeking diplomatic assistance from the State Department … or when a nation had indicated that it would

accept an alien, even though it was uncertain about when deportation could take place….”).

The district court thus erred in relying on the absence of travel documents as the basis for its finding that the government had not established SLRRFF. And as previously discussed, the sole impediment to rectifying Petitioner's current “removable but unremovable limbo,” *see Casteneda*, 95 F.4th at 758, is the district court's own injunction against removal which is preventing the government from completing the removal process.

## CONCLUSION

For the foregoing reasons, the Court should vacate the injunction against Petitioner's detention.

Dated: September 28, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General
Office of Immigration Litigation

*/s/ Ernesto H. Molina, Jr.*
ERNESTO H. MOLINA, JR.
Deputy Director
U.S. Department of Justice,
Civil Division
Office of Immigration
Litigation
P.O. Box. 868, Washington, DC
20044
Phone: 202-616-9344
Ernesto.H.Molina@usdoj.gov

*Attorneys for Respondents-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and with Local Rule 32(b) because it contains 7,339 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2026, the foregoing brief was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

Respectfully submitted,

*/s/ Ernesto H. Molina, Jr.*
ERNESTO H. MOLINA, JR.
Deputy Director